## McDonald v. Commonwealth.

(Decided October 19, 1917.)

Appeal from Franklin Circuit Court.

1. Homicide—Indictment—Sufficiency.—An indictment which accuses the defendant of the crime of murder and then charges every element necessary to constitute that offense, is not defective because of a failure to allege in terms that the defendant "did kill and murder the deceased."

2. Criminal Law—Change of Venue—Discretion of Court.—A change of venue in a criminal prosecution is within the discretion of the trial court and a judgment of conviction will not be reversed for failure to grant a change of venue, unless it is made clearly to appear that such discretion was abused.

3. Criminal Law—Trial—Continuance.—Where the defendant in a criminal prosecution, knowing of the absence of a particular witness and of the fact that the deposition of another witness had not been returned to the court, does not ask for a continuance on either ground, but announces ready and goes into the trial, he takes the chances of securing the attendance of the one and' the deposition of the other, in time for the trial, and a continuance asked for after the trial has been in progress for two days and the evidence for the Commonwealth has been heard, is properly refused.

4. Criminal Law—Trial—View by Jury.—The denial of a view by the jury in a criminal prosecution is within the sound discretion of the court, and will not be ground for disturbing a judgment of conviction, unless it appears that such discretion has been abused.

5. Homicide—Trial—Malice—Instructions.—On a trial for homicide, it is proper in the instructions to define malice in terms approved by the.Court of Appeals.

6. Homicide—Malice—Proof of.—Malice may be inferred by the jury from proof of circumstances tending to show an unprovoked murder.

7. Criminal Law—Trial—Failure of Defendant to Testify—Comment by Counsel—Prejudicial Error.—On 'a trial for homicide, evidence considered and held that an indirect reference by counsel for the prosecution to the fact that the defendant did not testify in his own behalf, was not prejudicial error.

L. F. JOHNSON for appellant.

CHARLES H. MORRIS, Attorney General, and D. M. HOWERTON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

This is an appeal by Eugene F. McDonald, who was convicted of murder and given a life sentence in the state reformatory.

According to the evidence for the Commonwealth, McDonald lived at Lexington, and was a general agent for several life insurance companies. One of these companies was the Aetna. The deceased, W. R. Dabbs, was a sub-agent working under the supervision of McDonald, but had no official connection with the Aetna Life Insurance Company. At the time of the homicide, McDonald had in his possession a policy in the Aetna Life Insurance Company, insuring the life of Dabbs in the sum of $7,500.00. Dabbs' wife was named as beneficiary in the policy, but at the time of his death, she did not know of the existence of the policy. A short time after McDonald's arrest the policy was mailed to Mrs. Dabbs. On the morning of June 16, 1916, McDonald sent Dabbs from Lexington to Frankfort on business and gave him some money to pay his expenses. Dabbs wore a dark, thin, striped palm beach suit and a black derby hat. McDonald left his office about half past ten or eleven o'clock the same morning and was not seen by his stenographer any more that day. He was met at the interurban station in Frankfort by B. Moore, on the arrival of the three o'clock car from Lexington. He inquired of Moore if anyone had been looking for him. He was seen the same afternoon on the streets of Frankfort by J. J. Downing, manager of the Western Union Telegraph Company, and Douglas Marshall, a messenger boy for the Postal Telegraph Company, both of whom knew and recognized him, and say that he saluted Mr. Downing from across the street. Between the hours of three and five o'clock, he spent an hour or hour and a half in the office of the Frankfort Elevator Coal Company, where he discussed insurance matters with Adolph Wells and Orville Harrod. While there, Harrod gave him the address of a man by the name of Fouschee, who was at the head of the American Life Insurance Company. Harrod spelled the name "Fouschee," and McDonald made the following memorandum on the inside of a back of a book: "Forschee-American Life." This book was found among McDonald's effects and introduced in evidence and the memorandum was identified by Harrod

as the one made by McDonald on the occasion in question. Another witness was of the opinion that the memorandum was in McDonald's handwriting. Some time between four and five o'clock, McDonald spoke to Cassius Woods, and inquired if the latter's father was in town. He further told Woods that he had a scheme to "get his father by" and would come over in the morning at nine o'clock. McDonald also asked for Woods' telephone number and stated that he would call his father up. Woods noticed that McDonald had on a light panama hat. S. W. Grace, telegraph operator at Cliffside, saw a man who had been pointed out to him as McDonald, and whom he identified as McDonald, about seven p. m. on the same day, on the L. & N. trestle about one-half mile from Cliffside. With him was a strange man whom witness did not know. The two men were going west towards Frankfort. He afterwards saw the two men in front of the Spring Hill Distillery about five minutes to eight. They were then going away from Frankfort in the direction of Cliffside. Ed. Roberts, while walking down the railroad late in the afternoon, in company with Will Hale, saw two strangers. One of them said, "What about a little insurance this evening." Along about nine o'clock McDonald was seen by another witness to pass out the Versailles road. While waiting for the 9:30 p. m. interurban car at the Green Hill station on the Versailles road, about three miles from Frankfort, Carroll Cleveland and Mrs. Shabinsky saw a man approach from the direction of Frankfort who inquired if the car was about due. He walked up and down the track and appeared to be in a highly nervous state. The witnesses identified the man as McDonald, and Mrs. Shabinsky says that McDonald took a seat near her in the car and pulling his hat down over his face, rode into Lexington. After the arrival in Lexington of the interurban car, Charles Lucas, night officer at the Phoenix Hotel, saw McDonald approach the clerk's desk dressed in a dark suit of clothes. After getting his key, McDonald went up stairs where he remained about ten minutes. He then came back and was dressed in a light palm beach suit. According to the best recollection of the witness, it was then a few minutes after eleven o'clock. When McDonald was spoken to about the death of Dabbs, he suggested that it was a case of suicide, because Dabbs was short in his accounts. Dabb's body was discovered about ten o'clock on the night of June 16th, about 175 yards from the east entrance of

the tunnel leading into Frankfort, on the L. & N. Railroad tracks. There was a bullet hole on the left side of the back of his head. There were no powder stains of any kind. No weapon was found near the body. On his body were some letters, insurance papers, note books and blanks. Near his body was a large envelope containing a package of papers. His right hand trousers pocket was pulled wrong side out. Footprints were discovered going over the bluff and down the steep bank towards the river. These footprints corresponded in size and in shape to the shoes worn by McDonald. Some time later a pistol was found on the bank of the river near the water. This pistol, though not identified as the same one, was similar in appearance to and of the same make, as one which McDonald had purchased in Lexington the fall before.

McDonald did not testify himself, but introduced several witnesses to show that he was not in Frankfort on the day of the homicide, but was in the city of Lexington. J. O. Reynolds, attorney at law, says that he was with McDonald between the hours of twelve and two o'clock at the Phoenix Hotel and remained with him until a few minutes after two. Miss Louise Turner was also present on the same occasion and testifies to the same effect. Dr. Ed Gordon, a well-known dentist of Lexington, says that he saw McDonald on Main street about 2:30 p. m., June 16th. John Skulley, who worked at McGurk's confectionery store in Lexington, is positive that he saw McDonald in Lexington shortly before seven o'clock that night. Robert L. Scott, who was present at the same time, corroborates Mr. Skulley. Alex. Hughes, who was soliciting members for the Board of Commerce of Lexington, saw McDonald in Lexington about fifteen minutes to twelve o'clock and took his application for membership. There was also evidence to the effect, that about the time the homicide was supposed to have taken place, a man resembling Dabbs was seen in the vicinity of the murder and nearby were several tramps. It was further shown, that in order to reach Frankfort at 3 p. m. it was necessary to take the interurban car leaving Lexington at 1:40 p. m.

We shall consider the grounds urged for a reversal in the following order:

1. The indictment is attacked because it did not allege that the defendant "did kill and murder the deceased." In the accusatory part of the indictment, the defendant is charged with the crime of murder "com-

mitted as follows," and the indictment then charges that
the defendant "did unlawfully, willfully, feloniously and
with malice aforethought, not in his necessary or to him
apparently necessary self-defense, but with intent to
kill with a pistol, a deadly weapon, loaded with powder,
leaden ball or other hard substance, shoot and wound one
W. R. Dabbs, from which shooting and wounding afore-
said, the said Dabbs did then and there presently die."
It will thus be seen that the indictment not only accuses
the defendant of the crime of murder, but in describing
how that crime was committed, alleges every element nec-
essary to constitute that crime. That being true, the in-
dictment is not defective because it failed to allege in
terms, that the defendant "did kill and murder" the de-
ceased. Hocker v. Com., 33 Ky. Law Rep. 944, 111 S.
W. 676.

2. The defendant asked for a change of venue on
the ground that the people of Franklin county were, for
various reasons, so prejudiced against him that he could
not obtain a fair and impartial trial in that county.
His petition was supported by the affidavits of two resi-
dents of Fayette county. Several counter-affidavits
were filed by the Commonwealth, denying the facts upon
which the application for a change of venue was based. It
is a settled rule in this state, that the question of a change
of venue is one that addresses itself to the sound discre-
tion of the trial court, and that a judgment of conviction
will not be reversed for a failure to grant a change of
venue, unless it is made clearly to appear that such dis-
cretion was abused. Hargis v. Com., 135 Ky. 578. In
view of the fact that the affidavits on which the appli-
cation for change of venue was based, were made by non-
residents of the county where the homicide occurred, we
cannot say that the trial court abused its discretion in
giving greater weight to the counter-affidavits which were
made by persons who were actual residents of that coun-
ty, and who were therefore in a better position to know
the state of public sentiment with reference to the de-
fendant.

3. Another ground urged for a reversal is the fail-
ure of the trial court to grant the defendant a continu-
ance. When the case was first called, the defendant
announced not ready, for the sole reason that the witness
Davis Wademore was absent. Defendant's motion to
continue was overruled with the distinct understanding
that the testimony of the witness, Wademore, which was

taken down at the examining trial, during which the witness was fully examined and cross-examined, should be read to the jury. The defendant then announced ready and the trial proceeded. After the trial had lasted for two days and the evidence for the Commonwealth had been completed, the defendant asked for a continuance on account of the absence of Chester E. Duff, and the failure of the deposition of the witness, Conway C. Wyatt, a resident of Meridian, Miss., to arrive in time for the trial. It appears from the defendant's affidavit that these witnesses would testify to facts tending to establish defendant's alibi at the time of the homicide; that Duff had been subpoenaed but had telegraphed that he could not attend the trial, because he had been subpoenaed to appear before the Breathitt grand jury and the circuit court of that county would not excuse him. It further appeared that a subpoena for Wyatt had been placed in the hands of the sheriff some time before the trial and returned "not found," and that on December 29, 1916, interrogatories and cross-interrogatories had been prepared and sent to Wyatt at Meridian, Miss., for the purpose of taking his deposition. The affidavit does not disclose the exact date when the subpoena for Wyatt was returned "not found," nor does it show that the defendant took steps to procure his deposition within a reasonable time after he discovered the absence of such witness and ascertained where the witness resided. When the case was called, defendant knew that Duff was not present and that the deposition of Wyatt had not been received, and did not ask for a continuance on either ground. On the contrary, he announced ready, and the trial proceeded. Not having at the proper time availed himself of either of these grounds for a continuance, but having gone into the trial with the knowledge that Duff was not present and that the deposition of Wyatt had not arrived, we conclude that he took the chances of procuring the attendance of the one and the deposition of the other before the conclusion of the trial, and that the continuance asked for, after the trial had been in progress for two days, was properly refused.

4. Complaint is made of the fact that the trial court refused to permit the jury to view the premises where the homicide is alleged to have occurred. We have frequently held, that a view of the premises by the jury is a matter which addresses itself to the sound discretion of the trial court. While a view of the premises in ques-

tion might have enabled the jury to understand more clearly the evidence on certain immaterial issues, it could not have elucidated the main issue in the case, and that is, whether the defendant was present and committed the crime or was in the city of Lexington when the crime was committed.   Under these circumstances, there was no abuse of discretion in refusing to permit the jury to view the premises.   Roberts v. Com., 94 Ky. 499; Young v. Com., 141 Ky. 708.

5.   In instructing the jury in homicide cases, it is the settled practice in this state for the trial court to define malice, and as the definition given in this case is one which has often been approved by this court, it follows that there was no error in this particular.

Nor was the defendant entitled to a peremptory because the Commonwealth failed to prove malice.   It is not necessary, of course, to show that the defendant expressed any ill will towards the deceased.   On the contrary, malice may be inferred from the circumstances surrounding the homicide, and where these circumstances tend to show an unprovoked murder, it cannot be said that there was not sufficient evidence of malice to make a question for the jury.

Lastly, it is insisted that Judge Williams, who was employed to assist in the prosecution, was guilty of misconduct in his argument to the jury.   As before stated, appellant did not testify in his own behalf.   According to the affidavit of one of the attorneys for appellant, Judge Williams used the following language:

"There were only two men present at the time of this murder, one of them was Dabbs, who was murdered, who is now dead and cannot testify in this case, and the other one sits in this court room during the whole trial of this case, and who knows all about the facts in this case, and he" (Judge Williams motioned towards the defendant, McDonald) "fails and refuses to go on the witness stand to explain how."

According to Judge Williams' affidavit he used the following language:

"There were no eyewitnesses to this killing; but two men know or knew who did it, Mr. Dabbs and the man who did the killing.   Dabbs is dead and no one has told us how it occurred."

The trial court did not undertake to decide what was the exact language used by Judge Williams.   His certifi-

cate of what took place, appears in the bill of exceptions and is as follows:

"Upon the filing of the affidavit of L. F. Johnson and the filing of the statement of V. A. Bradley and the affidavit of B. G. Williams, the court states that B. G. Williams in the course of his argument to the jury in behalf of the Commonwealth made statements (the exact language of which the court cannot now recall) tending to be construed as reflecting or commenting on the failure of defendant to testify without directly criticizing the defendant because of his failure to testify, and that upon defendant's objecting to said Williams' statement the court admonished counsel that no comment upon or reference to defendant's failure to testify could or should be made."

In view of these facts, we cannot undertake to decide which of the affidavits is correct, but must view the question in the light of the certificate of the trial court, that is, that Judge Williams "made statements tending to be construed as reflecting or commenting on the failure of defendant to testify, without directly criticising the defendant because of his failure to testify," and that thereupon the court admonished counsel that no comment upon or reference to defendant's failure to testify could or should be made. When so viewed, we conclude that the alleged misconduct of counsel was not prejudicial error under the peculiar facts of this case. Without questioning the good faith of those witnesses who testified to the defendant's presence in the city of Lexington on the afternoon and evening of the homicide, it cannot be doubted that the overwhelming evidence to the contrary was sufficient to justify the jury in concluding that those witnesses were mistaken. The memorandum which defendant made in his notebook speaks louder than words of his presence in Frankfort, and it was not shown that he was there on any other day and made the memorandum in question. The numerous witnesses who saw him and talked to him were positive as to the date and the time of the day. Mrs. Shabinsky and Mr. Cleveland were able to identify the occasion as that on which a relative of theirs had been buried. The defendant was not only seen alone, but was seen in company with a man answering the description of the deceased, near the place of the homicide and near the time when the homicide occurred. That he was subsequently seen coming from the direction of the place of the homicide, and that he took the 9:30

interurban car at a station about three miles from Frank, fort, is positively established by the testimony of at least three witnesses. Shortly after eleven o'clock he appeared in the lobby of the Phoenix Hotel dressed in a blue suit. He then went to his room and returned in a few minutes dressed in a light palm beach suit. When interrogated about the homicide, he suggested that the deceased had committed suicide because he was short in his accounts, and it was not made to appear that the deceased was short in his accounts. On the contrary, the location of the wound and the absence of powder stains, completely negative the theory of suicide. Not only so, but the footprints leading down the bluff from the scene of the homicide, corresponded in size and shape to the shoes worn by the defendant. The pistol which was subsequently found on the river bank after the water had subsided, and from which a shot had been fired, corresponded in size, shape and make to one which the defendant had purchased in the city of Lexington the fall before. All these circumstances, which the defendant did not deny or explain, made his failure to testify so apparent to the jury, that this fact could not have received any additional emphasis from counsel's reference thereto. Indeed, the facts developed by the prosecution point so unerringly to the guilt of the defendant, that we have no doubt that the same verdict would have been returned by the jury had no reference of any kind been made by counsel to the fact that the defendant did not testify in his own behalf.

Notwithstanding the able argument made in behalf of defendant, we perceive no error in the record prejudicial to his substantial rights.

Judgment affirmed.

Whole court sitting.