David NICHOLS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Oct. 14, 1955.

C. Ewbank Tucker, Louisville, for appel-lant.

J. D. Buckman, Jr., Atty. Gen., Zeb A. Stewart, Asst. Atty. Gen., for appellee.

STEWART, Chief Justice.

David Nichols, convicted of the wilful murder of Mary Georgia Roberts and sentenced to death, has appealed and urges these grounds for reversal: (1) There was no evidence of malice aforethought as to the crime committed; (2) the trial judge failed to properly admonish the jury with

respect to evidence of prior convictions of felonies by appellant; and (3) the lower court did not instruct the jury on the whole law of the case.

In order to determine the validity of the first ground, we must review the evidence. Eight witnesses testified in chief for the Commonwealth, and the knife with which appellant did the fatal cutting, along with two photographs, were admitted in evidence. Appellant was the only witness who took the stand in his own behalf. Three witnesses testified in rebuttal for the Commonwealth.

Mary Georgia Roberts and appellant, both colored, had been living together in concubinage for 8 or 9 months prior to the killing. According to appellant, on the morning of May 21, 1954, they departed from their home in Louisville to go to their respective places of work with the understanding that he would pick her up that afternoon. However, around 2:30 or 3:00 p. m. Mary left her job and proceeded to the home of her mother, Emma Ferguson, in or near Anchorage. Appellant went to meet Mary after he had finished his day's work but failed to find her where she had agreed to wait for him. When he got back to his home he was unable to get in, so he went to a niece's house around 5:30 p. m. at 120 Oldham Street and from there 'phoned Mary at her mother's home. Emma Ferguson answered the call and summoned Mary to the telephone. Appellant said Mary asked him to come after her.

Around 7:00 or 8:00 p. m. he called a taxicab to take him to the Ferguson residence. Raymond Smith, the taxicab driver, picked appellant up at 120 Oldham Street and was paid in advance for the trip to Anchorage and back. En route, appellant appeared normal and calm to Smith. Upon reaching his destination, appellant got out, went inside, and Smith parked his taxicab in front of the Ferguson house and waited for the return of appellant. Smith said appellant was gone for about 10 minutes. Inside the house were Mary and her sister, Jonetta Marshall, who had arrived at the home of her mother around 6:30 p. m. with her six small children. All were watching television. According to Jonetta, appellant knocked on the door around 10:00 p. m. and Mary went to the door. From this point on the testimony is in conflict as to what transpired.

The Commonwealth insists there was only one eyewitness to the killing, namely, Mary's sister, Jonetta. The following is her story: Emma Ferguson and Jonetta's six children were in a back bedroom asleep at the time appellant entered the living room. When Mary got up from her chair to answer the knock on the door appellant came in and spoke to Jonetta. The latter then retired to the bedroom to feed her baby. An open archway separated the bedroom from the living room and she said Mary and appellant were never out of her sight. As she raised up from the bed where the baby lay and looked through the archway, she saw appellant in the act of stabbing her sister in the neck with a knife. No words had been previously spoken between appellant and the deceased. Mary was in a sitting position in the chair and appellant stood over her, knife in hand, slashing the upper part of her body. Jonetta screamed and called for her mother who came running from the bedroom, but, by this time, appellant had left the living room and was already outside the house. Jonetta rushed to the window, saw the name of the taxicab appellant had come in, telephoned the police and reported the incident.

Emma Ferguson testified she had gone to bed around 9:00 p. m. When she entered the living room she saw Mary slumped on the floor rug near a chair in a pool of blood. She also testified that two weeks prior to the killing Mary had come to the Ferguson residence with her face swollen and a tooth knocked out. Appellant later came for her and pleaded with her to return to his home, saying, "I won't bother you any more", and induced her to go back to him.

A road block was thrown up in the neighborhood and the taxicab was soon intercepted on U. S. 60 near St. Margaret

and St. Mary's Catholic church. Gabriel Hibbs, a county policeman, arrested appellant and took a knife from his shirt pocket which had blood and hair on it. Appellant was turned over by Hibbs to another county policeman, Lawrence Gaffney, who took him to a police substation. While they were at the substation Gaffney told appellant Mary was in bad shape and appellant thereupon replied: "I went out there to kill her. I hope she is dead. I don't care if I die too." Woodrow Wilson, a police detective, testified appellant talked to him at the time of the examining trial and admitted he had deliberately stabbed Mary.

In the meantime another policeman had gone to the scene of the killing. Mary was found lying in a pool of blood in front of a chair in the living room. She was still alive and was put on a stretcher and then taken to the hospital but she was dead on her arrival there. Harry P. Elstone, a deputy coroner who perfomed an autopsy on Mary, testified he found four wounds on her body, two of which were superficial. There was a stab wound in her back; another, in her neck, had nicked the jugular vein and the carotid artery; and it was this last cut that caused a hemorrhage from which she had died.

Appellant, in giving his version of the killing, claimed he and Mary had left their home the morning of the 21st day of May in a gay and happy mood. He later journeyed to the home of Emma Ferguson to obtain the door key and the room rent from Mary. He denied going out there for the purpose of slaying her. Mary opened the living room door and let him in after he had knocked on the door. Each greeted the other with "good evening" and Mary then sat down in a chair. Appellant knelt beside her and said, "Mary, come on, let's go home because I've got a cab out here, and it costs money." Mary promptly replied, "Wait until I see this program on television and then I will be ready to go." Jonetta was in the room at that time and soon Emma Ferguson came in with an iron poker in her hand. The latter told appellant her daughter was not going back with him and appellant answered: "I'm

talking to some one that belongs to me." According to him, Emma Ferguson then dealt him a blow on the arm with the poker. Appellant stood up, backed toward the wall and pulled a knife from his shirt pocket. At this juncture, Mary jumped between appellant and her mother and pleaded that he not harm her mother. Appellant spoke, saying: "I'm not going to hurt your mother and I don't want your mother to hurt me." Emma Ferguson kept coming with the poker and appellant opened the knife. Mary threw her arms around him and he begged her to turn him loose. He stabbed at Emma Ferguson, who by that time was closing in on him, but the knife sank in Mary's neck instead. Mary cried out: "You done stuck me", and walked back to the chair. Jonetta grabbed Emma Ferguson and appellant then left the house. On cross-examination, when asked about the stab in Mary's back, he explained that it must have happened when he was reaching over Mary's shoulder to strike at her mother. He admitted he did not stay to investigate how badly Mary was hurt but had quickly left the living room after he had delivered the death dealing blow. He denied making the statements to Gaffney and Wilson admitting he had intentionally stabbed Mary. Instead he insisted he told them he went to the Ferguson house only to get the key and the room rent.

This is the picture. Doubtless the whole story has not been told as to the events leading up to the crime. But upon the evidence before us we are convinced a case was made out by the Commonwealth that amply supports the jury's verdict of wilful murder.

 In the face of the foregoing evidence appellant's contention that the offense of which he was convicted was committed without malice aforethought is wholly devoid of merit. The words "malice aforethought" mean a predetermination to commit an act without legal justification or excuse. Such may be proved by either direct or circumstantial evidence, or it may be established by the very fact of the killing itself. Any homicide deliberately

and cruelly committed is a fact from which the jury may find malice aforethought. However, it is within the province of the jury alone to determine its existence from the circumstances attending the criminal act. Rose v. Commonwealth, 286 Ky. 53, 149 S.W.2d 772; Harrison v. Commonwealth, 279 Ky. 510, 131 S.W.2d 454; McDonald v. Commonwealth, 177 Ky. 224, 197 S.W. 665; Ewing v. Commonwealth, 129 Ky. 237, 111 S.W. 352.

■ In the case at bar, the testimony of Jonetta Marshall, an eyewitness of the crime, made out a complete case of premeditated and deliberate murder with no semblance of self-defense, justification or excuse. From her testimony alone the jury would be justified in concluding that malice aforethought existed. Furthermore, there was proof that appellant revealed his mental attitude toward his victim, shortly after he was arrested, when he said: "I went out there to kill her. I hope she is dead." Although he emphatically denied he made the statement we have just quoted and although he gave an explanation as to how the deceased was stabbed, which explanation would tend to make his act appear an accident while he was attempting to defend himself, the jury chose not to believe his story, and we are not inclined to disturb their verdict.

■ The next complaint concerns an alleged failure upon the part of the lower court to properly admonish the jury when appellant was asked if he had been convicted in the past of certain felonies. After his counsel had opened this subject on direct examination, the Commonwealth's attorney cross-examined appellant at some length as to whether he had been convicted only one time, as testified to by him when questioned by his counsel, or four times, as contended by the Commonwealth's attorney in his cross-examination. While the latter was interrogating appellant in this regard, and although no objection was interposed by appellant's counsel to this line of questioning at any time, the court on its own motion properly admonished the jury to consider this evidence solely for whatever effect it might have on appellant's credibility as a witness and to no further extent.

■ We fail to see where the trial judge failed in his duty on this score. It is the law of this jurisdiction that the Commonwealth may show for the purpose of attacking the credibility of a witness that he has been convicted of a felony and this, together with the punishment he received, may be brought out either by a court record or by the witness himself. White v. Commonwealth, 312 Ky. 543, 228 S.W.2d 426; Bates v. Commonwealth, 260 Ky. 551, 86 S.W.2d 322; Quillen v. Commonwealth, 275 Ky. 158, 120 S.W.2d 1047. This rule applies as well as to the accused as to an ordinary witness. Bolin v. Commonwealth, 206 Ky. 608, 268 S.W. 306; White v. Commonwealth, supra. CR 43.07, which is also applicable to criminal cases, provides the basis for the principle just stated.

■ It is inferred in the brief of appellant's counsel that the lower court did not instruct the jury on the whole law of the case. We say "it is inferred" for the reason that it is not pointed out in what respect the instructions were lacking. The instructions covered wilful murder and voluntary manslaughter, setting forth the maximum and minimum punishment the jury might impose in each instance. The expressions "wilfully" and "with malice aforethought" as used in the wilful murder instruction were defined. The usual self-defense and death caused by an accidental act instructions were submitted in appellant's behalf. The proper reasonable doubt instruction was given. These instructions undoubtedly were the only ones the evidence in this case warranted.

We are of the opinion the record has in it no prejudicial error or any violation of any substantial right of appellant and we therefore conclude the judgment should be, and it is, affirmed.