## Blair v. Commonwealth.

(Decided October 4, 1916.)

### Appeal from Graves Circuit Court.

1. Criminal Law—Prosecution for Housebreaking—Evidence.—In a prosecution for the breaking into a blacksmith shop, where it appeared that the shop had been broken into at night and a sledge hammer stolen, and on the following night defendant was

recognized as one of two men who were seen using the same hammer in an attempt to break into a store and who, when discovered, fled through a muddy alley, followed by the one who discovered them until they threw away the hammer and almost to their home; and where it also appeared that when arrested the same night his shoes were muddy, evidence held sufficient to require submission of the case to the jury.

2.  Criminal Law—Evidence—Trailing by Bloodhounds—Admission Of.—Testimony as to the trailing of the accused by bloodhounds may be permitted to go to the jury for what it is worth, as one of the circumstances tending to connect the defendant with the crime, when it is shown by someone having personal knowledge of the facts that the dog in question is of pure blood, is of a stock characterized by acuteness of scent and power of discrimination, is itself possessed of these qualities and has been trained and tested in the tracking of human beings; and also that the circumstances surrounding the laying of the dog on the trail and following it, were such that the dog was not likely to have been put upon the wrong trail or confused or obstructed in following the trail.

3.  Criminal Law—Evidence.—Mere general statements by a witness that the dogs used in trailing the defendant were bloodhounds, trained for trailing persons, and that one of the dogs had been used for trailing all his life, were not sufficient, in the absence of personal knowledge on his part that they had been so trained and one of them so used, to so demonstrate the reliability of the dogs as to authorize the admission of testimony as to the trailing done by them.

4.  Criminal Law—Evidence—Former Conviction of Felony—How Shown.—In this jurisdiction the former conviction of a felony must be shown by the introduction in evidence of the indictment, verdict, judgment and sentence of the former trial, or certified copies thereof; and the admission by the trial court of the testimony of a circuit court clerk as to defendant's former conviction of two felonies, supported only by his production of the indictments, which the record fails to show were either read or offered to be read to the jury, is prejudicial error.

5.  Criminal Law—Trial—Right of Accused to be Free From Shackles.—The manacling of a person when upon trial for a criminal offense, whether in bringing him into court, while in the presence of the court or jury or at any stage of the trial, is very improper, and can be excused only on the grounds that it was necessary to prevent his escape, prevent injury to his own person or probable danger to the court, its officers or to bystanders from his violence, or to prevent some such misconduct on his part as would obstruct the work or business of the court.

WEBB & WEAKS for appellant.

M. M. LOGAN, Attorney General, and CHAS. H. MORRIS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

The appellant, Rogers Blair, and one Robert Crump, both persons of color, were jointly indicted in the Graves circuit court for the crime of housebreaking; that is, it was charged in the indictment that they unlawfully, wilfully, with force and arms did break and enter into the blacksmith shop of J. T. Smith, in Graves county, with the felonious intent to take, steal and carry away therefrom property of value, and did in fact unlawfully, wilfully and feloniously take, steal and carry away a sledge hammer and hand-axe, the property of value of J. T. Smith, convert same to their own use and deprive the owner thereof permanently. In a second paragraph the indictment charged Blair with the breaking as principal and Crump as aider and abetter. In a third paragraph Crump was charged with the crime as principal and Blair as aider and abetter. In a fourth paragraph it was charged that Blair had been previously indicted for and convicted of two other felonies, both indictments and convictions being in the Hickman circuit court, the first for housebreaking and the second for incest. Under the first indictment his punishment was fixed by a verdict of the jury and judgment of the court at two years' confinement in the penitentiary and under the second, by verdict of a jury and judgment of the court, at five years' confinement in the penitentiary, both of which terms of punishment were served by him.

In the instant case his trial resulted in the following verdict:

"We, the jury, find the defendant, Rogers Blair, has heretofore been twice convicted of felony in the Hickman circuit court and we find Rogers Blair guilty in this case and fix his punishment at confinement in the penitentiary for his natural life.

"J. W. Farmer, Foreman."

Judgment was entered in conformity to the foregoing verdict and the refusal of the court to grant appellant a new trial led to this appeal.

It appears from the record that appellant filed a demurrer to the indictment and took an exception to the overruling of same by the trial court. The brief of his counsel fails to show wherein the indictment is defective, either in form or substance. It sufficiently alleged the crime committed by appellant in breaking into the

blacksmith shop, which is made a felony by section 1164. Kentucky Statutes, and also his conviction of the two felonies for which he was previously indicted and tried in the Hickman circuit court, and section 1130, Kentucky Statutes, provides that conviction for the third time of a felony shall be punished by confinement in the penitentiary for life. The indictment is good and the demurrer was properly overruled.

It is here proper to briefly state the facts relied on by the Commonwealth to show appellant's guilt of the crime of housebreaking. Early in January of the present year the blacksmith shop belonging to J. T. Smith was forcibly broken into and entered in the night-time. The breaking was done by prizing open the door. The only property taken from the blacksmith shop at the time of the breaking was a sledge hammer and a hand-axe. It was shown by the testimony of Luther Smith and Percy Barnes, who worked in the shop, that at the hour of quitting work they locked and securely fastened up the shop as usual, but on the next morning they found that a side door had been forced open during the night, the shop entered and the tools mentioned taken therefrom. On the night following Dr. Bard, a physician, returned to his home from a professional call made in the county and upon entering his house sat down by a light and commenced to read, but soon fell asleep. He was awakened by a noise which he supposed to have been made by his horse in a stable near the residence. Securing an electric flashlight owned by him he left the dwelling house and started towards the stable. While on the way to the stable a repetition of the noise convinced him that instead of proceeding from the stable, as he had supposed, it came from the storehouse of Cameron & Acre, nearby. He thereupon moved toward the store and when near it threw his flashlight in the direction of the sounds, upon doing which he discovered two men, whom he identified as the appellant, Blair, and Crump, one using the sledge hammer on a door of the store and the other standing near him. As soon as the flashlight was turned upon the two men at the store they fled through an alley and were followed by Dr. Bard almost to their home, but were not overtaken by him. Dr. Bard then went back and gave an alarm, which brought to the store the city marshal and others, among them a man by the name of Robert Pigue. The party began a search for

the two negroes. Pigue, who was the owner of a pair of bloodhounds, led them to the place where the hammer had been thrown by the party using it on the store door. At that point the dogs took up a trail which they followed to the house occupied by both Blair and Crump, where they were found in bed and immediately arrested. The hammer left by the two persons who made the attempt to break into the store of Cameron & Acre was identified as the hammer of J. T. Smith which had been taken from his blacksmith shop the night before. The surface of the alley through which the two men, who were followed by Dr. Bard, fled was wet and soft, showing plainly the tracks made by them, and when appellant and Crump were arrested the shoes of both were muddy.

The appellant, Blair, testifying in his own behalf, denied any participation in the breaking of the blacksmith shop or the attempt to break into the store; claimed that he got home about sundown after a day's work performed for a Mr. Farmer; that his feet were wet, which caused him to pull off his shoes and place them under a stove, after which he sat around a while, ate some hickory nuts and popcorn and about 7:30 o'clock went to bed, where he was found when arrested. The other negro, Crump, when put on the stand also denied any connection with the breaking of the blacksmith shop or attempt to break into the store, and claimed, in substance, that Percy Barnes and Bob Pigue offered to pay him fifty dollars to help them make it appear that the appellant, Blair, had broken into the blacksmith shop, but that in fact it was broken into by Barnes, Pigue and Luther Smith in his (Crump's) presence, and the hammer and hand-axe taken therefrom for the purpose of being so placed as to make it appear that they were in the possession of Blair and that he had broken into the blacksmith shop. This testimony of Crump was denied in toto by Barnes, Pigue and Smith and contradicted by Dr. Bard's identification of Blair and Crump as the persons who tried to break into the store of Cameron & Acre and were there using the hammer taken from Smith's shop the night before.

We think the evidence sufficient to have required the submission of the case to the jury. The identification by Dr. Bard of Blair and Crump as the persons he saw attempting to break into the store and their possession and use in such attempt of the sledge hammer that had

been taken from the blacksmith shop when that building was forcibly broken and entered the night before, together with the muddy condition of the alley, the tracks therein and the mud on their shoes, were circumstances tending to establish their guilt of the shop breaking, for which reasons the jury had the right to consider them in determining the question of appellant's guilt. We are convinced, therefore, that appellant's complaint of the refusal of the trial court to grant a peremptory instruction directing his acquittal is without merit.

Appellant complains that the evidence admitted on his trial of the trailing done by Pigue's dogs was incompetent and should have been excluded. In Pedigo v. Commonwealth, 103 Ky. 41, 24 L. R. A. 432, it was held "that testimony as to trailing by bloodhounds of one charged with crime, may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime, when it is shown by someone having personal knowledge of the fact that the dog in question is of pure blood and of a stock characterized by acuteness of scent and power of discrimination, and is itself possessed of these qualities and has been trained or tested in their exercise in the tracking of human beings, and that the dog so trained or tested was laid on the trail, whether visible or not, concerning which testimony has been admitted at the point where the circumstances tend clearly to show that the guilty party had been or upon a track which such circumstances indicated to have been made by him."

In Denham v. Commonwealth, 119 Ky. 508, evidence of the trailing of the defendant by bloodhounds was held to have been properly admitted, their work having been done on the same night the crime was committed, their heads held up when taken from the wagon until put on the trail and that care was taken by the family on whose premises the crime was committed to prevent persons from going to or about the place of its commission, in order that the bloodhounds might not be confused or obstructed in following the trail of the criminal; also that the dogs through whose instrumentality the criminal was thus apprehended were shown to be of approved pedigree and carefully trained in tracking men; the older one having run down and aided in the capture of sixty-three criminals and the younger in the capture of several. In the opinion it is said: "There-

fore the testimony as to the trailing done by them in the capture of appellant and Cottrell was properly allowed to go to the jury for what it was worth as one of the circumstances tending to connect the appellant with the crime for which he was convicted."

But in Sprouse v. Commonwealth, 132 Ky. 269, it was held that the evidence as to the trailing of the defendant by the dogs through whose agency he was arrested, should not have been admitted, because of the indefiniteness of the evidence as to their previous training and its insufficiency to demonstrate that they were possessed of such acuteness of scent and power of discrimination, or so trained and tested in the tracking of human beings, as proved them accurate and reliable.

In the instant case, the only witness who testified as to the qualities of the dogs was their owner, Robert Pigue. He was asked, "Have you got some blooded dogs?" to which he answered, "Yes, sir." In reply to further questions he also said that one of the dogs was about eight years old and the other about three or four; that they were bloodhounds; that he had owned them about two years; that one of them had been used all his life in trailing people and that they were trained by George W. Simpson, at Dyersburg. It will be observed that the testimony gives no information as to the pedigree of the dogs. It is true the witness also said they were bloodhounds, but whether they were thoroughbred bloodhounds or of such strain or breeding as are characterized by acuteness of scent and power of discrimination and by reason thereof customarily trained for use and used in trailing persons, was not stated by the witness; and the general statement of the witness that one of the dogs had been used for trailing all his life and both had been trained by Simpson, does not show that he had personally known of their being used for trailing a person at any time or that Simpson was an expert in the training of bloodhounds for such purpose. Applying to the testimony of the owner of the dogs the test approved by the authorities, supra, we are constrained to declare it insufficient to demonstrate the reliability of the dogs whose trailing was relied on to convict the appellant in this case. As said in the opinion of Pedigo v. Commonwealth, supra:

"It is well known that the exercise of a mysterious power not possessed by human beings begets in the

minds of many people a superstitious awe, like that in-
spired by the bleeding of a corpse at the touch of the
supposed murderer, and that they see in such an exhibi-
tion a direct interposition of divine providence in aid
of human justice. The very name by which the animal
is called has a direct tendency to enhance the impressive-
ness of the performance, and it would be dangerous in
the extreme to permit the introduction of such testimony
in a criminal case under conditions which did not fully
justify its consideration as a circumstance tending to
connect the accused with the crime.''

It is our conclusion, therefore, that the admission of
evidence of the trailing done by the dogs was error.

It is also insisted for appellant that his conviction
of the two former felonies was not established by com-
petent evidence, and this contention we must also sus-
tain. The evidence referred to was furnished by the
witness, J. M. Kemp, clerk of the Hickman circuit court,
who produced in the presence of the jury two indict-
ments, one of which he said charged appellant with the
crime of housebreaking and the other with that of in-
cest. The record fails to show that either indictment
was read to the jury or that it was asked that they be
considered read. It was also testified by the witness that
each of these indictments contained an endorsement
showing that it had been found by the grand jury and
returned by that body in open court and filed therein,
but the record fails to show that these endorsements
were read. The witness was also permitted to give the
names of the persons composing the respective grand
juries that returned the indictments, and that they were
empaneled and sworn, but did not read or produce any
record showing their names or that they had been em-
paneled or sworn. He was also permitted to state the
contents of the verdict returned against appellant under
each of the indictments, but he did not produce or read
either of such verdicts. It is customary for the verdict
in a criminal case to be written on the back of the in-
dictment, but whether the verdicts against appellant re-
ferred to appear upon the backs of the indictments was
not shown. The witness was also permitted to testify
as to the contents of the judgment entered and sentence
pronounced upon the appellant under each of the in-
dictments, without producing or reading the judgments
themselves. In fact, it does not appear from his testi-

mony that he had in his possession or that he produced
or read in the presence of the jury any order, judgment,
or other record, or certified copy thereof, save the in-
dictments themselves, showing any of the proceedings
with respect to the trial or conviction of appellant of
the former felonies. The whole of the testimony of
Kemp was objected to by the appellant and exceptions
were taken by him to the court's rulings in admitting
the several parts thereof.

In this jurisdiction, a former conviction of a felony
must be shown by the introduction in evidence of the
indictment, verdict, judgment of conviction and sen-
tence of the former trial, or by certified copies thereof.
Kentucky Statutes, section 1627; Lucas v. Common-
wealth, 142 Ky. 416; Smith v. Gowdy, 29 Ky. L. Rep.
832; Greenleaf's Evidence (Lewis Ed.), section 507. Ap-
pellant's conviction of neither of the former felonies
charged in the indictment in the instant case was shown
by either of the methods referred to, and the admission
by the trial court of the testimony of Kemp as to the
contents of the records of the Hickman circuit court was
prejudicial error, compelling a reversal of the judgment
of conviction.

It is the further contention of the appellant that he
was greatly prejudiced in his substantial rights and, in-
deed, prevented from having a fair trial, by the action
and ruling of the circuit court in permitting him to be
brought into court and in the presence of the jury, by
the jailer, with handcuffs on and also handcuffed to an-
other prisoner, and to remain so manacled during the
greater part of the trial, to which, as the record shows,
he at the time objected and excepted. As the judgment
must be reversed for the errors already indicated, it is
unnecessary to declare whether this ruling of the court
last set forth, of itself, constitutes such error as would
require a reversal. We, however, regard it our duty to
say that the manacling of a person when upon trial for
a criminal offense, whether in bringing him into court,
while in the presence of the court or jury or at any stage
of the trial, under such circumstances as appear to have
attended the handcuffing of appellant, cannot be too
strongly condemned. The record furnishes no justifica-
tion for the great indignity to which he was thus sub-
jected. Indeed, it could have been excused only on the
grounds that it was necessary to prevent his escape, pre-

vent injury to his own person or probable danger to the court, its officers, or to bystanders, from his violence, or to prevent some such misconduct on his part as would have obstructed the work or business of the court, none of which grounds is manifested by the record here.

The law, as we understand it, is well stated in 12 Cyc. 529, as follows:

"At common law defendant, although indicted for the highest crime, must be free from all manner of shackles or bonds, whether on his hands or feet, when he is arraigned, unless there is evident danger of escape. In the United States the common-law rule is followed, and shackling defendant during arraignment, during the calling and examination of the jurors, or at any time during the trial, except in extreme cases to prevent escape or to protect the bystanders from the danger of defendant's attack, is reversible error."

In 8 R. C. L. 68, a more elaborate statement of the law will be found under the title, "Right to be free from shackles:"

"At early common law when a prisoner was brought into the court for trial, upon his plea of not guilty to an indictment for a criminal offense, he was entitled to make his appearance free from all shackles or bonds. This is his right today in the United States. The spirit of the law is that a prisoner, upon his trial before a jury, shall have the unrestrained use of his limbs, and shall not suffer any physical bonds or burdens which might tend to confuse or embarrass his mental faculties. Furthermore, a prejudice might be created in the minds of the jury against a prisoner who should be brought before them handcuffed and shackled, which might interfere with a fair and just decision of the question of the guilt or innocence of such prisoner. It is recognized that it lies within the discretion of the trial court to have the prisoner shackled when it is manifest that such a precaution is necessary to prevent violence or escape, and an appellate court will not revise the trial court's action except in a clear case of abuse of discretion. In exercising its discretion the court must have some reason, based on the conduct of the prisoner at the time of trial, to authorize so important a right to be forfeited. There must be some immediate necessity for the use of shackles. A defendant has the right to have his witnesses unmanacled for the same reasons

that he is allowed to be so. The right extends alike to the arraignment, the selection of the jury, and all other periods of the trial; but the defendant may be handcuffed while he is being taken to and from the court house and the jail, especially where it appears that he is a desperate and dangerous criminal, without violating any of his constitutional rights. And the mere fact that a prisoner, brought before an examining magistrate, remains handcuffed during the proceedings, and in that condition waives a preliminary examination, will not support a plea in abatement. There is no impropriety in having an armed guard keep watch over a defendant on trial for murder in the first degree where the evidence shows that he is a dangerous and desperate character. The failure, through an oversight, to remove shackles from a prisoner for a short time after proceedings have commenced, or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for a new trial; but where there is a substantial violation of the right, a new trial will be granted.'' People v. Harrington, 42 Cal. 165, 10 Am. Rep. 296; Matthews v. State, 9 Lee 128, 42 Am. Rep. 667; State v. Williams, 18 Wash. 47, 39 L. R. A. 821; State v. Chase, 17 N. Dak. 429; State v. Temple, 194 Mo. 237.

Appellant's counsel point out no error in the instructions given on the trial, their sole contention with respect to the law of the case being that a peremptory instruction should have been given directing the acquittal of appellant.

Objections made to the admission of evidence, other than that already held incompetent, need not be discussed, further than to say that we find none of it to be incompetent.

For the reasons indicated, the judgment is reversed and cause remanded to the circuit court, with directions that appellant be granted a new trial consistent with the opinion.