## Stidham v. Commonwealth.

(Decided June 7, 1927.)

## Appeal from Carter Circuit Court.

1. Homicide.—Evidence in prosecution for voluntary manslaughter held sufficient for jury.
2. Criminal Law.—Verdict of jury in criminal cases, which has been approved by circuit court, will not be disturbed on appeal, unless clearly against the evidence.
3. Criminal Law.—Court of Appeals will not disturb finding of trial court in refusing change of venue, unless his discretion is abused, since he is on the ground and has more or less knowledge of local conditions and value of testimony of each witness.
4. Criminal Law.—Refusal of motion for continuance because of absence of witness held not to show abuse of discretion, where affidavit showing testimony that would have been given was read as deposition, and witness was beyond jurisdiction of court, and, if case had been continued, all defendant could have done would have been to take his deposition.
5. Homicide.—Instruction on other than murder held not erroneous, where evidence would warrant inference that difficulty had occured between defendant and wife, and that in this difficulty wife was killed.
6. Criminal Law.—In prosecution for manslaughter, proof as to training by bloodhounds held admissible after testimony by owner that bloodhounds were 100 per cent. pedigree hounds, and one had been used 3½ years and one about one year, and that he had found them accurate in tracking human beings.
7. Criminal Law.—Court of Appeals is only authorized to reverse criminal case when it finds error in the record prejudicial to substantial rights of defendant.

WAUGH & HOWERTON, G. W. E. WOLFFORD and AUSTIN FIELDS for appellant.

FRANK E. DAUGHERTY, Attorney General, and G. D. LITSEY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Affirming.

Jerry Stidham was indicted in the Carter circuit court for the willful murder of his wife, Nancy Stidham. On the trial of the case he was found guilty of voluntary manslaughter, and his punishment was fixed at 15 years in the penitentiary. He appeals.

The facts shown by the commonwealth are these: Jerry Stidham was 73 years old; his wife, Nancy, was 61. They had known each other from childhood. They were married in October, 1925, and lived on a farm in Carter county. Each of them had children by a former marriage, living in homes of their own. On Sunday, February 21, 1926, about daylight, he appeared at the house of Ocie Engdahl, who lived about 150 yards from him. She heard some one at her door like he was crying. She opened the door and it was Mr. Stidham. He said something awful had happened at his home; said robbers came there; three men came; that he had started to feed and had gone out the front door; the men saw him middle way between the gate and the house; they said, "We will just tie you right here," and told him if he moved they would kill him; one of them went in the house first; he heard his wife say to them that she knew them, and they would pay dear for this; he did not hear anything more, except the turning over of chairs or something. He said, "I went in the house after they left, and I believe they have killed my wife," and he had come down to her. He asked her to cut these strings. His hands were tied up against his breast. She took a paring knife and cut the rope. She cut it in front and behind. It was tied in two knots. It was rope. She asked him to stay there while she went after Mr. Everman, another neighbor. He said, "No;" that he would go on back home; and she went for Mr. Everman as quickly as she could. Soon she and Everman and some other neighbors gathered at the house. When they got there they found Mrs. Stidham lying on her back on the floor at the foot of her bed. The bedclothes and mattress were all thrown back to the springs. The drawers of the dresser were pulled out, and the things in the drawers indicated that they had been pushed back in disorder after being taken out. The same was true of the drawers of the sewing machine. Mrs. Stidham's pocketbook was lying on the floor, empty. Stidham showed them his pocketbook lying out in the yard also empty. He went to the dresser and showed them a box from which he said his watch had been taken. Mrs. Stidham never spoke intelligently, and died in two or three hours. She had received 10 or 12 blows about the head, a V-shaped blow in the forehead, and a number of blows about the back part of the head in straight lines. The skull was not fractured, but the scalp was loose.

There was blood on the walls of the room at places or on things hanging on the wall. Stidham's trousers were sprinkled with blood below his knees and there was blood on his shoes. Both of Mrs. Stidham's eyes were closed and dark. The neighbors made a search for the robbers, but failed to find any, or any tracks. Some bloodhounds were brought, and they were placed at the point which Stidham indicated. They trailed from there to the well, from the well to the back door, and thence to the room where Stidham was. The day after the tragedy the neighbors bailed the water out of the well and in the bottom of the well they found a watch, which Stidham admitted to be his. When the first person got there and went to Mrs. Stidham, he met Mr. Stidham at the door, and he said he thought his wife was dead. They went in to her and loosened a string which was holding a cloth around her neck. After this she breathed better. The persons who got there later testified that the ashes on the grate indicated that cloth had been burned upon the grate, and they also found up in the orchard a place where there had been fire and on the edge of the ashes a piece of a vest of Stidham. But there was no proof that the fire was fresh. One witness testified that, when they were dressing Mrs. Stidham for burial, she started to go into a closet to get a dress for her, and Mr. Stidham stopped her and shut the door of the closet, telling her the dress was in a drawer of the dresser. She then went to the dresser and got the dress, but after this some one opened the closet and found in there a bloody towel. Stidham had scratches on the back of his hands and blood was running down from these scratches over his fingers. When his attention was called to this, he pulled his sleeves down and put his hands behind him. According to the proof for the commonwealth, he objected to the bailing out of the well, saying it was unnecessary. According to the proof for the commonwealth, the bed did not indicate that any one had slept in it, and the blood on Mrs. Stidham's dress in front was dried, while there was much fresh blood on the back of her clothes.

The proof for the defendant was that, after the robbers left, he tried to get his wife up, lifting her head up with her shoulders against his knees, and in this way got the blood on his trousers and shoes. He proved by his son, his grandson, and a jeweler, who had repaired his watches, that he had two watches, and he testified that

he had dropped one of his watches in the well four or five weeks before when the bucket in the well got hung and he was leaning over trying to straighten it up. He sustained his testimony on this point by a witness, who testified that Stidham had told him of the occurrence before the homicide. He proved by a number of witnesses that there were a great many bloody things about the room and that when the doctor came and dressed the wounds these bloody things were burned in the grate, making the ashes afterwards seen there. He also testified that the night before his wife was suffering from sore throat and put some Vick's salve on a piece of woolen cloth and put the cloth around her neck and then tied a string around the cloth to hold it on. The cloth with Vick's salve was there on the foot of the bed after she was dressed for burial. He said that the robbers scratched his hands when they tied him with the rope and took his pocket book and his watch. His wife, he said, had been cleaning house the week before, and had put a lot of old things in the closet, and asked him to burn them, and this he did, making the fire out in the orchard, at the place shown by the commonwealth, and among these things was an old vest of his.

The commonwealth showed by two of Mrs. Stidham's sons and one daughter-in-law that Stidham and his wife were not living happily together for some weeks before her death, and that he was complaining much about her. On the other hand, he proved by his grandson, who lived in the house with them, but was not there the night she was killed, that they were living happily together and there had been no trouble of any kind. A number of the neighbors who saw them from time to time also testified to the same effect. Stidham proved, by unimpeached testimony of his neighbors and other persons in the county, that he was a man of good character. There was no contrary evidence. He had lived in the neighborhood for 40 odd years, and had accumulated some property.

As to the way he was tied, when he appeared at the house of the neighbor, the witness gave this testimony:

"Q. Had to cut it in the back? A. Yes, sir.
"Q. How many times did you have to cut it before you could get him loose? A. Three or four times; twice in front.

"Q. Know whether there was more than one strand of rope in his back? A. There was two and they crossed."

While the evidence is circumstantial, it cannot be said that there is no evidence showing the plaintiff's guilt; and while the jury might well have found him not guilty, under all the evidence it cannot be said that the verdict of the jury is palpably against the evidence. The jury is the tribunal fixed by the Constitution for the trial of criminal cases and the verdict of the jury, which has been approved by the circuit court, will not be disturbed here, unless clearly against the evidence.

Complaint is made that the court erred in refusing the defendant a change of venue. A large number of affidavits were filed on both sides, on this question. It is a well-settled rule of the court not to disturb the finding of the court on such a showing, unless his discretion is abused. He is on the ground and has more or less knowledge of local conditions and the value of the testimony of each witness. On all the evidence it cannot be held that he abused a sound discretion in overruling the motion. Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176.

Complaint is also made that the court erred in overruling the defendant's motion for a continuance. The only important witness who was absent was John Dent Lewis, by whom the defedant showed that he could prove that on the morning of the tragedy three strange men got on a freight train at Leon about 9 a. m., and rode with him to Ashland, giving their description, which tallied with the description of the robbers given by the defendant on the trial. The court allowed this affidavit to be read as the deposition of the witness. The defendant insisted that the affidavit should have been taken as true, but by the act of 1920 (Acts 1920, c. 57), the court in its discretion may at the appearance term permit the affidavit to be read only as the deposition of the witness. The case was tried at the appearance term in April, about 60 days after the defendant's arrest. The witness was shown to be in the navy and beyond the jurisdiction of the court. If the case had been continued, all the defendant could have done would have been to take his deposition. This was all he asked a continuance to enable him to do. When the affidavit was read as the deposition of the witness, he got all that he would have gotten by taking the deposition. The witness was beyond the juris-

diction of the court and it was not shown that his presence could be obtained if the trial was postponed. The circuit court, therefore, did not abuse a sound discretion in refusing a continuance on account of the absence of this witness. The other witnesses, referred to in the affidavit for a continuance, were in the main witnesses as to character and the defendant got the full benefit of their testimony when the affidavit was read as their deposition.

Complaint is made that the court instructed the jury on anything but murder, and it is insisted that the defendant was either innocent or had murdered his wife. But there was no witness to what occurred. It is the rule of the court that instructions, such as those the court gave, should always be given where there are no witnesses to the homicide, and the case is to be determined by inferences from the facts shown. If the evidence for the commonwealth was true, the jury were warranted in inferring that a difficulty had occurred between the defendant and his wife, and that in this difficulty she was killed. At least there was some evidence of this, and the instructions as given by the court were proper. Rutherford v. Commonwealth, 13 Bush 608.

It is complained that the proof as to the bloodhounds was improperly introduced. The owner of the bloodhounds had been a policeman in Huntington for 12 years. He testified that he brought with him a couple of bloodhounds which were "100 per cent pedigree hounds;" one he had used 3½ years and one just about a year; that he had found them accurate in the tracking of human beings. On this showing, there being no other evidence and no effort by cross-examination to bring out the facts more fully, the evidence was properly admitted. Pedigo v. Commonwealth, 103 Ky. 41, 44 S. W. 143, 42 L. R. A. 432, 82 Am. St. Rep. 566; Blair v. Commonwealth, 171 Ky. 319, 188 S. W. 390.

On the whole case the court finds no reversible error in the record. This court is only authorized to reverse a criminal case when it finds an error in the record prejudicial to the substantial rights of the defendant. There being no such error, the judgment cannot be disturbed.

Judgment affirmed.