## Tate v. Commonwealth.

(Decided March 1, 1935.)

C. J. WILSON for appellant.

BAILEY P. WOOTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At the trial in the criminal branch of the Jefferson circuit court of an indictment accusing him of murdering Cecil Carter on June 15, 1934, the appellant and defendant therein was convicted and punished by death. His motion for a new trial was overruled and he prosecutes this appeal, insisting through his counsel that the court erred in committing a long list of complaints discussed in brief, but which are readily condensable into these grounds: (1) Error of the court in overruling defendant's motion for a continuance; (2) in overruling his motion for a change of venue; (3) in refusing to excuse jurors for having read newspaper accounts of the murder; (4) in the court making a remark during the progress of the trial that "the killing had been proven"; (5) in permitting guards to stand at the door of the courtroom during the trial; (6) erroneous remarks of prosecuting counsel in his argument to the jury; and (7) error in the failure of the court to give an instruction on intoxication of defendant.

Before taking them up for determination separately, a statement of the substantial facts should be made. The scene of the killing was at or near the junction of Cypress and Woodland streets in that portion of the city of Louisville, Ky., known as "Parkland." In one corner (or near thereto) of that junction was a filling station operated by a man named Schroering. About 9 o'clock that night the proof uncontradictedly shows that two men entered that station, one of whom was low and heavy set, and the other slim and much taller, the latter of whom was and is the defendant. A housewife sitting upon her porch opposite the station saw the two men make their entry and saw the proprietor go back with them into a rear partitioned room and the taller one then came back into the front room and emptied the cash drawer or depository, and, while doing so, or immediately thereafter, some shots were fired in the rear room when the other member of the invading couple emerged from that room and the two shortly thereafter departed from the station. But just preceding that, Mr. Carter and his wife had passed by or near to the station and had reached another part of the junction when defendant (the taller one) deliberately aimed in his direction and fired some shots, one of which fatally wounded Carter, who died shortly thereafter. In the meantime, and just before Carter was shot, surrounding dwellers, who had heard the shooting in the back

room of the filling station, rapidly started for the scene, all of which imperilled the safety of escape by the two participants, and no doubt the shot that killed Carter was fired for the purpose of checking the onrushing crowd and to thereby enable the two participants to escape safely.

The low heavy set man was Willard Hall, who killed Schroering in the back room of the station, and he, according to the evidence, likewise killed another neighbor by the name of Horine as he was making his escape from the scene of his first depredation. So that, three innocent persons lost their lives as a result of the robbery of the filling station. The housewife, who testified to what we have related, positively identified defendant as the one who shot Carter. Other witnesses who testified for the commonwealth, and who were present on the occasion, corroborated her to some extent as to the shooting and a number of them corroborated her as to the taller one of the two being defendant. A description of the manner and extent of such corroboration is deemed unnecessary to state, especially so, since defendant admitted on the stand when testifying in his behalf that he was present at the time and place of the fatal occasion and also admitted the shooting of the proprietor of the station in its back room by Hall, and which fact he claimed frightened him so that he sought to make his escape along with his companion, but he denied that he shot Carter or that he fired his pistol at any time, although he previously admitted it in his proven confession.

Before going to the scene, and at about 6:30 of the same evening, appellant, Hall, Gilbert Gibbs, and Leo J. Tesner started out on what he describes as an aimless joy ride about over the city in the car of Tesner, who was driving it, and who has but one arm. He stated that the other three first suggested to him that they make a trip to Bowling Green, but for what purpose he did not state. It was abandoned, however, because appellant had to report for work in which he was engaged at 10 o'clock that night and they substituted the city ride for the Bowling Green trip. While engaged in it, they stopped at a number of restaurants where appellant says they took some beer and he likewise drank some whisky that he claims the other three had when he entered the car. According to defendant,

just before going to the filling station, the car was stopped two blocks away from the scene of the killing and that he was thirsty and wanted a drink of water. Hall said he had some business down the street at an unnamed place and at which appellant's thirst could be quenched, and in order to do that he went along with Hall, who as they were entering the door of the filling station gave him a .38-caliber pistol, but which he claims he never fired. Hall had a .45-caliber pistol and the testimony showed that the wound inflicted on Carter was made by a 38 rather than by a 45 size bullet.

Some hour or more after the killings and the robbery, defendant and others of his companions were arrested, but Hall, although with them at the time, made his escape and was later apprehended. At the time of his arrest defendant denied any connection with any of the criminal acts and stated that he was not present at the time. However, when confronted with an identifying letter found on the floor of the filling station he made a confession which was in writing and was subscribed and sworn to by him, in which he admitted everything, and which was and is in these words: "About two weeks ago, I met a white man named Bill (Tesner) who has his right arm off about his elbow and a white man named Joe at 6th & Oak Sts. on the corner by the drug store. And Bill had a Chevrolet sedan 1931 model. I got in the car with them and we went to Central Park and sit in the Park till 9:30, and they asked me if I was ever in any trouble and I told them no. They brought me back to 427 S. 3rd St. where I work and let me out of the car. About four days later I met them at Pap Logan's Place at Preston & Chestnut Sts. This was about 7 P. M. And they left about 8:30 P. M., and I left about 9:30 P. M., and about two days later I met them at Pap's Place again about 7:30 P. M. and went riding in the car with them and we picked up three girls at 2nd and Jefferson Sts. We then went to Jacobs Park and parked on the hill. We stayed there awhile and they took me home first. June 15, 1934, about 6:45 P. M. I was at 427 S. 3rd St. at the Transit Bureau where I worked and Bill and Joe came by and picked me up, and they said they were going to Bowling Green and asked me if I wanted to go, and I asked Clarence Cook, my foreman, if I could go and he said I had to be in at 10 o'clock. I got in the car with them and drove to the west end of the town. Bill told me

they were going to stick up an oil station in the west end. Bill was driving the car and and he stopped the car about a square from a filling station, and me and Bivens (Hall) got out of the car, and I had my gun in my bosom which was a .38 S. & W. squeeze-handle nickel plated. Bivens walked into the filling station with his .45 caliber pistol in his hand, and there was no one in there but the attendant, and I heard Bivens say: 'Stick 'em up.' The man started to put his hands up and Bivens shot at him twice. I then ran out the front door and Bivens followed me, hollering: 'Get out of the way people.' Bivens fired at the people who were running towards the filling station and I fired once or twice at the people running toward the filling station. Bivens and I ran over to where we had parked the car, and the car was gone, and Bivens and I caught a cab at 18th & Hale Sts. and we went to 3rd and Broadway. We got out of the cab and walked up 3rd St. to Chestnut St. and out Chestnut to Preston St. and went to the Happy Day Cafe on Preston St. between Gray & Chestnut Sts. and we both had a glass of beer. We were sitting at a table when two men came in who I later learned were detectives and they called me outside and left Bivens sitting at the table, and the detectives asked me who was with me. I told them that man in there, meaning Bivens, was with me and they started after him and he was gone. The detectives brought me down to Detective Headquarters. I had only two drinks of whisky and four glasses of beer before the holdup. This gun I used in the holdup and fired at these men was given to me by Bill, the one-armed man, who drove the car, while we were on the way to the west end.''

That confession was made to some of the policemen of the city, but the substance of it was also made to a couple of newspaper reporters after defendant had been lodged in jail and which they, or at least one of them, took down in shorthand. Defendant admitted the confession made to the policemen, but claimed that it was done under duress and in violation of our statute known as the "Anti-Sweating Act (Ky. Stat. sec. 1649b-1 et seq.).'' However, that avoidance urged against its competency was strenuously denied by the officers and some others who heard it, and the court properly protected defendant's rights with reference thereto in its instructions to the jury. On the stand, defendant denied knowledge of any unlawful purpose

of his companions at any time during that night, which not only contradicts his confessions, but which testimony was contradicted on several material points by some of the persons present at different places visited by the quartet before committing the robbery. In addition thereto, the circumstances surrounding the whole transaction are utterly at variance with such innocence of purpose and intention on the part of defendant or his other companions. On the contrary, every circumstance points to the inescapable conclusion that the mutual determination was to rob some one or more during that night. To say the least of it, no unprejudiced person can read this record without coming to that conclusion.

When arrested, defendant had the same pistol that he claims was given to him by his companion, Hall, just before entering the filling station, and it was completely loaded with nonfired shells; but there was testimony in the case that it was reloaded by defendant on his trip from the scene back to the city after the escape was made and which trip was made in a taxicab that defendant ordered for the purpose, the other two companions having disappeared from the place where they had stopped, because of the local commotion following the depredations. It was uncontradictedly proven, by undeniable expert testimony, not only that the pistol found on defendant when he was arrested had been recently fired, but likewise that some of its chambers had also been recently fired, and which was ascertained by taking out the reloads and examining the cylinder. While defendant claims that he was intoxicated, he did not say that it was to such extent as that he did not know what he was doing, or that he was deprived of distinguishing between right and wrong. On the contrary, he gave an intelligent account of what he claimed occurred throughout that evening, including the conduct and actions of himself and his companions while at the filling station and during their departure therefrom. There are many proven circumstances in the case clearly pointing to the guilt of defendant which we have not and will not specify, since what we have stated abundantly authorized the verdict of guilty, and we will now proceed to a consideration of the enumerated grounds.

■ Defendant filed no affidavit of himself for a continuance, but his counsel did file a written signed statement (not verified) in support of the motion, and

in which he stated, in substance, that the time since his employment (thirteen days) was not sufficient for him to prepare "an adequate defense." No fact was made to appear to the court by which it was possible that the defense could be strengthened through any delay, nor was any other fact shown from which it could even remotely be concluded that justice to the defendant would require a postponement of the trial. The facts were simple, and really involved but a single issue, and which was: Did defendant fire the shot that killed Carter? No alibi was relied on, nor any other defensive facts happening away from the scene that would require witnesses to establish. Defendant's account of the places he visited before the robbery and the murders committed was in the main accepted and not disputed, and under the circumstances it would be a travesty to hold that the court erred in overruling the motion based upon the only showing made. See Holmes v. Commonwealth, 241 Ky. 573, 44 S. W. (2d) 592, and others therein referred to.

■ On the hearing of the motion for a change of venue, defendant introduced no testimony except the affidavits of the three persons, filed in support of his motion. On the other hand, the commonwealth did introduce a number of officers, ex officers, physicians, and others prominent in the life of the city, all of whom testified in substance that out of the population of nearly half a million inhabitants of Jefferson county an unbiased jury could be obtained to try defendant, and they gave their reasons therefor. Under the Holmes opinion, and those of Heck v. Commonwealth, 163 Ky. 518, 174 S. W. 19; Greer v. Commonwealth, 164 Ky. 396, 175 S. W. 665; McDonald v. Commonwealth, 177 Ky. 224, 197 S. W. 665; Frazier v. Commonwealth, 182 Ky. 620, 207 S. W. 13; Vaughn v. Commonwealth, 204 Ky. 229, 263 S. W. 752; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 5; Stidham v. Commonwealth, 221 Ky. 49, 297 S. W. 929; Mullins v. Commonwealth, 227 Ky. 514, 13 S. W. (2d) 535, and others referred to in them, it cannot be held that the court erred in overruling the motion, and for which reason this ground is without merit.

■ The Holmes Case, supra, together with others cited therein on the same point, clearly disposes of this ground adversely to the contention of appellant. Be-

sides, the amendment of 1888 to section 209 of the Criminal Code of Practice (Acts 1888, c. 945) expressly disallows this ground as one supporting a challenge for cause. Morover, it nowhere appears that any one on the jury list who had read the newspaper accounts of the homicide was eventually accepted on the jury, or that defendant was compelled to accept any such one because of having exhausted his peremptory challenge.

■ During the progress of the trial some dispute came up about the admission of certain testimony relating to the fact that Carter was killed, and the court remarked, in substance, that it had already been proven and suggested to counsel to direct his examination to the investigation of some other issue, and it is this action of the court that furnishes the foundation for this ground. A mere statement of it is sufficient to demonstrate its lack of merit; but in view of the fact that every one admitted that Carter was killed by some one, the court's repeating that undisputed fact to be true, furnishes nothing that even approaches error, much less anything that creates it as counsel contends, and this ground must also be declared as without merit.

■ At the opening of the trial, or shortly thereafter, it was discovered by the court that a great many of the sensationally inclined, who compose a large per cent. of society, were trying to gain entrance into the courthouse, and to prevent any overflow of visitors, persons, some of whom were officers, were stationed at the doors of the courtroom and kept the overflow crowd back, and it is this action of the court of which complaint is made in this ground; but we regard the contention as merely a straw at which counsel is grabbing, and which may not be dignified by classifying it in the meritorious column, instead of the action of the the court being criticized. It is to be commended for a number of reasons that will at once suggest themselves.

■ The substance of the remarks complained of in support of this ground was a vigorous urging by the commonwealth's attorney for the infliction of the severest punishment which he insisted was necessary to protect the local community, as well as society in general, from the widespread state of brigandage universally prevalent. In performing that task, he made remarks of substantial import of those that were com-

plained of in the Holmes Case, supra, and also in the cases of Glenday v. Commonwealth, 255 Ky. 313, 74 S. W. (2d) 332; Bolin v. Commonwealth, 206 Ky. 608; 268 S. W. 306; Hall v. Commonwealth, 207 Ky. 718, 270· S. W. 5; Moore v. Commonwealth, 223 Ky. 128, 3 S. W. (2d) 190, and others referred to therein. It was held by us in those and other opinions that such argument with reference to what might happen, if an imprisonment punishment was inflicted, was not in strict accord with proper practice, and that counsel should be prevented by the court from indulging in it upon proper motion therefor. But, notwithstanding such recognition by us, we held in those cases that a conviction would not be reversed therefor, unless other circumstances in the case clearly established the fact that it was substantially prejudicial to defendant's rights, and we found in those cases that it was not so under their facts, and which do not differ from the facts of this case in that respect. We again admonish prosecuting counsel throughout the commonwealth not to indulge in such statements, but which, after all, are but facts with which the average juror is perfectly familiar. Under our recently rendered opinions, supra, we do not feel that this error, under the facts of the record, is sufficient to authorize a reversal of the case.

■ While this ground is stated as constituting one of the errors committed by the court, it is not argued in any classified·form in counsel's brief, and no case upholding the contention is cited. For this reason alone, under an established rule of appellate practice, we could dismiss it without further comment; but, inasmuch as the judgment forfeits the life of appellant, ·we have concluded to pass upon its merits. The question as to the effect of voluntary intoxication in criminal prosecutions arises in two ways—(a) as to the right of the defendant to introduce evidence thereof, and (b) as to the duty of the court to instruct the jury thereon, and pointing out to it the effect to be given such intoxication. It is only the latter one (b) to which we need refer, since the defendant was allowed by the court to say all he wished as to his state of intoxication. Text-writers, as well as courts, are not in harmony as to when such an instruction should be given, or as to the defensive effect of intoxication of the defendant, except they all agree with the statement that it has no defen-

sive effect unless the intoxication is so complete and of such an advanced degree as to totally deprive the defendant of his reason and to render him incapable of knowing right from wrong. In other words, that the intoxication must be, in order to be available, of that degree and extent as renders the defendant practically an automaton with the loss of his rudder of reason, thereby depriving him of the ability to entertain a criminal intent.

Our opinions are not free from such apparent confusion as will be seen by comparing the case of Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509, and the more recent ones of Graham v. Commonwealth, 200 Ky. 161, 252 S. W. 1012, Shorter v. Commonwealth, 252 Ky. 472, 67 S. W. (2d) 695, and Vance v. Commonwealth, 254 Ky. 667, 72 S. W. (2d) 43, 45. In the Harris Case it was held that no degree of intoxication should be allowed any defensive effect under the facts therein; but that appears to have been founded on the fact that there was evidence in that case that a predetermination to commit the murder had already been formed by defendant, and to nerve him for the purpose he brought about his voluntary intoxication. The other cases seem to adhere to the rule that voluntary drunkenness does not excuse homicide, but it may be shown in evidence to reduce the crime from murder to voluntary manslaughter, as will be seen from the Vance opinion, 254 Ky. on page 66, 72 S. W. (2d) 44.

However, all domestic cases follow the general rule that, unless the intoxication is proven to the degree and extent indicated, there should be no instruction with reference to it. Thus in the case of Brennon v. Commonwealth, 169 Ky. 815, 185 S. W. 489, 492, wherein the question was involved, we said: "Before, however, a court is required or justified in giving an instruction, which submits a defense to a jury for its consideration, there must be evidence upon which to base such instruction. * * * The appellant was the only witness who gave testimony as to his mental condition at the time. There was no one who could so certainly know his mental condition as he knew it, and if he failed to state facts showing that he was too drunk to know his acts and their quality, it follows conclusively that he did not bring himself within the right to rely upon such a defense for his acts. There is a large difference between being drunk and being drunk to such an extent

as not to know the acts one commits or their quality."
In a later opinion in the case of Hayes v. Common-
wealth, 171 Ky. 291, 188 S. W. 415, 418, in approving
the same practice, we said: "The defendant may have
been drunk, but nevertheless, judging from his evidence,
he knew everything that he did as well as the things
that he did not do, and attempted to establish by his
evidence every fact necessary to show his innocence of
the crime charged. He had sufficient sense and discre-
tion to arrange a plan for getting in the house and to
escape when discovered, and to take off his shoes and
put them in his pocket so that he would make no noise
in walking. A criminal who has sufficient mind and
memory to give a connected narrative of everything
that happened and to relate in detail all the facts and
circumstances that might excuse his conduct is not in a
good position to insist that he was entitled to an in-
struction on the subject of drunkenness merely because
he testifies that he was drunk."

Those expressions, announcing the proper practice,
completely fit this case. It was not claimed by defend-
ant in any part of his testimony that his prior imbib-
ing produced any greater effect than to intoxicate him.
He not only failed to state that it bereft him of reason,
or of his power to distinguish between right and wrong;
but the manner of, and the lucidity with which he recol-
lected and stated every fact that occurred on the fatal
night, including what transpired at the location of the
homicide, and his detailed narrative of his movements
thereafter bring his case clearly within the rule con-
tained in the excerpts, supra, from the Brennon and
Hayes Cases, and which clearly justified the court's
refusal to give the instruction contended for.

In the oral argument of this case, defendant's coun-
sel stated, as he does also in his brief, that he was de-
prived of the right to confer with his client after the
latter was imprisoned awaiting his trial. There is not
a line nor a word in the record to that effect, but, on
the contrary, it is expressly proven that he did make
visits to his client while in jail and there accompanied
him at one time a witness who testified in the case.
It was further argued by counsel that in order to
induce defendant to make the written confession re-
ferred to he was beaten and his body lashed by
the officers who took it. He sought to establish that
fact by the witness that he took along with him on

the proven visit to the jail—but what that witness saw upon the body of defendant was clearly shown to be the result of injuries received by defendant in an auto-' mobile accident that occurred a short time before the commission of the homicide, and which was proven by a number of witnesses, including a nurse or an interne who treated him for such injuries at the place where defendant was then engaged at work, and where he boarded and lodged. We have treated the questions raised as though they were all properly brought to this court for consideration after having been raised below, although some of them were not preserved and brought here in the manner which we have declared necessary for that purpose.

We have given this case most serious consideration, and we frankly admit that we would have been pleased to have found some ground by which defendant's present situation might be alleviated by granting him a new trial. But we are unable to do so, since we are not impressed with the argument that his age (20), through sympathy, should magnify an unmeritorious ground into a meritorious one. It is a lamentable fact that the safety and peace of society has become seriously threatened by the prevalence of bands of brigands who pursue a course of total disrespect and disregard for law, and who have taken up, as their profession, the robbery of others of their justly earned property, and which is frequently accompanied with murdering of the innocent. The situation calls for stern measures on the part of every one connected with the enforcement of the law, and no laxity should be extended or favor shown, unless it plainly appears that the one asking it has been unjustly deprived of his rights. We find no such situation here, but, on the contrary, the record is overwhelmingly convincing that defendant and his associates embarked on the fatal evening upon a marauding excursion, and in carrying it out three innocent men lost their lives.

Finding no reversible error in the record, the judgment is affirmed.

The whole court sitting.