## Edwards v. Commonwealth.

(Decided May 1, 1936.)

ROY W. HOUSE for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

At about 4 p. m. on September 6, 1935, Harvey Edwards was shot from ambush while he was traveling a road supposedly in a wagon, from the effects of which it is surmised he died at some time that night while lying on the porch of his residence. His son, the appellant, Lon Edwards, who is only fifteen years of age, was later indicted for murdering his father. At his trial he was convicted and punished by life imprisonment, and the court sentenced him to confinement in the school of reform at Greendale, Ky., until he is 21 years of age, and the judgment directs that he then be removed to Frankfort, Ky., to be confined in the penitentiary during the remainder of his life. From the verdict and the judgment pronounced thereon he prosecutes this appeal, relying upon a number of alleged errors as grounds for a reversal, chief among which is: (1) That the evidence is insufficient to support the verdict and that his motion for a peremptory acquittal should have been sustained; but if mistaken therein, then (2) that the verdict is flagrantly against the evidence.

Rarely have we encountered a record in this court so incomplete and so lacking in direct proof of essential facts as is true with reference to this one. There is no proof, except insufficient inferences, that the deceased was shot in Clay county, Ky.; nor is there any proof, except hearsay, as to the place where he was shot; nor any proof by any professional witnesses that he died from the effects of such shooting. It is shown that the weapon used by the assassin, whosoever he was, was a shotgun, and a layman witness described in a most general way the parts of decedent's body that were penetrated by the shots—but, whether

they were bird shot or larger ones is nowhere intimated throughout the record, nor were any of the inflicted wounds described. Esquire Howard, a justice of the peace in Clay county and also Colonel May, another witness for the commonwealth, testified as to what they saw at a place by the side of a road upon which the deceased was supposed to have been traveling, and which they stated that they had been told was the one from which the shots were fired. That place was a sort of improvised blind made by sticking broken cucumber limbs in the ground by the side of a rock and behind which was a trampled down place, which, according to the Squire, had the appearance of having been lain upon by the supposed assassin. Strange as it may seem, no witness was introduced who discovered or saw at any time the body of the deceased in its wounded condition at that or any other place, until his body was carried to the home of his sister, Anna Lee Smith, some three hundred yards from the improvised ambuscade. She claims to have heard the report of the gun and testified that it was about 4 o'clock on that afternoon. She did not say, nor does any one else say, how long it was after that until the wounded man was discovered, and after which his body was brought to her house and put upon the porch in front of it. Later it was removed to his home about one mile away and deposited on its porch, where it remained until he died.

Just why the commonwealth introduced no witness who found or saw Harvey Edwards at the place where he is supposed to have been shot and to have described the condition and surroundings thereof is not explained anywhere in the record. The first reference to him in his wounded condition relates to .the time after he had been deposited on the porch of his sister's residence and when he was not yet dead, but, as we infer, he was then, and thereafter remained, speechless. Whether or not there had been a mortal wound inflicted upon him is nowhere disclosed, and whether or not any such wounds produced his death rests also in inference alone. The same is true, as we have said, with reference to the venue of the supposed place of wounding, as well as the place where he expired. Having said this much with reference to the

paucity of the proof touching the material facts referred to, we will now briefly rehearse the substance of the proof connecting appellant with the death of his father, but before doing so we will state that defendant did not testify at the trial, nor did he introduce any witness in his behalf, contenting himself with offering a peremptory instruction of acquittal at the close of the commonwealth's testimony.

The commonwealth introduced Willie Edwards, a brother of deceased, who stated that he lived in Knox county, Ky., about two miles from his deceased brother; but he nowhere stated that his brother lived in another county. He testified that appellant came to his house on the supposed day of the killing with a shotgun, arriving there about 1:30 o'clock in. the afternoon, and delivered to him a message from his brother (the appellant's father) to the effect that the deceased wanted witness to assist him the next day in harvesting some hay, and that appellant left in about ten or fifteen minutes in the direction of his home. He testified that the gun that appellant was carrying, when originally manufactured, was a 16-gauge one and that it had been bored out so as to make a 12-gauge one. He then detailed some local geography of the neighborhood and stated that he did not see appellant again until he was arrested and in jail.

Squire Howard testified. that the next morning he went to the improvised ambuscade, at which some one had told him the shooting occurred, and examined it; that while there he saw a shoe track more than eleven inches long, and correspondingly wide, and which appeared behind the rock supposed to have screened the assassin. He then testified that he and others who were present (but none of whom was introduced) traced those tracks across a hollow and up a hill beyond which they were lost in the leaves. But neither he nor any other witness who was introduced testified to the size of appellant's foot or that it corresponded with the size of the described shoe track, although witness when later in company with appellant observed his feet but could not tell whether he had shoes on or was barefooted, or if the former, whether or not the shoes appeared to be of similar size to the tracks he had seen

and described as being at the supposed place of the killing.

Gracie Edwards, an eleven year old sister of appellant, was introduced by the commonwealth and she stated that her father left in the early afternoon of that day with a wagon, intending to go to some sawmill with some merchandise that he was carrying to a retail store at or near the sawmill site located at some point on Otter creek; that her brother (appellant) left about ten minutes thereafter for the home of his uncle, the witness Willie Edwards, to deliver to him the message from the deceased above referred to, and that he carried with him a shotgun, but which she was unable to describe, and that her brother and father went in opposite directions; that later in the afternoon (the hour not being given) he returned with the gun and was driving four hogs that he claimed were his father's and which he had found running at large and was returning them home; that a younger brother informed her after appellant's return that her father had been killed, but which, of course, was pure hearsay, and wholly incompetent; that appellant, and, perhaps, other members of the family then went to where her wounded father was; but whether that place was at the supposed point of the road where he was shot or after he was carried to the home of his sister (Mrs. Smith), does not appear; that after deceased was brought to the home of decedent, appellant stayed with him until the time of burial. She also testified that her brother, the appellant, was barefooted both when he left home and when he returned.

Following her testimony, as so given, the commonwealth introduced Colonel May as a witness. He testified that he, in company with others in the late afternoon of the fatal day went to the supposed spot where deceased was shot, and stated that "I thought I saw a sign there" which "I took it to be a barefooted sign." He says that he saw no other such imprint either at the spot or anywhere around there, or going away from there. Gracie Edwards had testified that her mother and other children, including appellant, went from their home to the Anna Lee Smith home, and that her mother carried the gun that appellant carried and returned with from the trip to his uncle earlier in the

afternoon, and which was left at the Smith residence. Squire Howard also testified that he located and obtained a gun (the gauge of which had been enlarged as above described) at the home of Colonel May which the latter testified he obtained from Harrison May, and that he procured Colonel May to fire that gun and that there were peculiar marks on the shell made by the firing which compared with a shell that some one found at the ambuscade above described the next morning after the supposed killing. However, the witness who found that shell, or is supposed to have found it, was not introduced, nor did Squire Howard, the one who testified about it, see that person find it at the spot— the only information he had according to the proof, as to where that supposedly found shell was obtained was what the finder told him, he being a member of the coroner's jury, but was never introduced.

The county attorney was introduced by the commonwealth and testified to what appellant stated before the grand jury, he being brought from the jail before that body. It is not shown that his appearance before the grand jury was voluntary, or that the alleged proven statements were made pursuant to any such voluntary appearance, and under the facts disclosed by the record the testimony as to them was clearly incompetent. As given, they were, in substance, that the two shells above referred to were exhibited to appellant while testifying before the grand jury and he stated that they were fired from the gun "that was alleged to be his, or that he had at the time mentioned on this occasion." Witness also testified that appellant stated that on his return from the trip made to the home of his uncle he met up with Arthur Keen, who also had a shotgun, and that the two exchanged guns, following which Keen left him and was gone about an hour and returned when a re-exchange of guns was had, and which latter event was about 3 o'clock. He also testified that he procured appellant's appearance before the grand jury for the purpose of ascertaining who had committed the murder, but that appellant denied any participation therein and stated that he did not know who committed it. Arthur Keen was not introduced, nor was any reason given for not doing so; neither was Harrison May introduced for the pur-

pose of explaining how he obtained the gun which was later obtained from Colonel May and with which the experimental shooting above described was made. Such failure to properly identify the gun introduced at the trial had the effect of destroying the greater part of all suspiciously incriminating circumstances.

In thus appears that the general outline of the testimony as so given is totally deficient in many partic ulars, and much of it is rank hearsay, while some of it (particularly the testimony as to appellant before the grand jury) was wholly incompetent, unless qualified by testimony proving circumstances rendering it competent; but none of which appears anywhere in the record. If we should accept the evidence introduced as entirely competent, it is doubtful if it raises any more than a suspicion that appellant may have committed the murder. No motive was even attempted to be proven as a cause for him to commit the patricidal deed. So far as the record discloses, the best of feeling existed between him and his father, and on the very afternoon of the fatal occasion he was engaged on a mission of obedience to his father's request. The only supposed tracks testified to as appearing in the supposed place of the shooting of deceased were not proven to be similar imprints made by the foot of appellant, either shod or unshod, and from all of which our earlier statement concerning the incompleteness of the record to sustain the conviction clearly appears.

We deem it unnecessary to indulge in further comment, except to say that it is doubtful if the record properly discloses the necessary obtention of jurisdiction of appellant by the Clay county juvenile court so as to legally entitle it to enter the order transferring the prosecution to the Clay circuit court. All that record contains with reference thereto are some orders of the juvenile court, but none of the prior steps to obtain necessary jurisdiction to make them were introduced. We have held in an unbroken line of cases that it should affirmatively appear, in the prosecution in the circuit court of a juvenile charged with a felony, not only that the juvenile court had made an order transferring the prosecution to the circuit court, but it also should so appear that all necessary steps to give juvenile courts jurisdiction to render such an order

were followed. Some of the many cases in which we so construed the statute are Talbott v. Commonwealth, 166 Ky. 659, 179 S. W. 621; Waters v. Commonwealth, 171 Ky. 457, 188 S. W. 490; Compton v. Commonwealth, 194 Ky. 429, 240 S. W. 36; Angel v. Commonwealth, 231 Ky. 132, 21 S. W. (2d) 150; Grise v. Commonwealth, 245 Ky. 220, 53 S. W. (2d) 362; Watson v. Commonwealth, 247 Ky. 336, 57 S. W. (2d) 39, and others listed in those opinions. They also hold that such failures are fatal to the circuit court prosecution at any time, and that it is the duty of this court to so treat them, whether the question was raised in the trial court or not.

Wherefore, because of the defects, omissions, and failures of proof to which we have referred, the judgment will have to be and it is reversed, with directions to sustain appellant's motion for a new trial, and to set aside the judgment for proceedings consistent with this opinion.