## Crawford v. Commonwealth.

(Decided May 26, 1936.)

ROBERT J. WATSON and CHARLES E. HERD for appellant.

B. M. VINCENT, Attorney General, and A. E. FUNK, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

Ed Anderson, Wade Eastridge, and the appellant, David Crawford, were indicted for the murder of Floyd Turner, and, on his separate trial, David Crawford was convicted and his punishment fixed at death. The indictment charged a conspiracy, and that in pursuance of such conspiracy and while it existed David Crawford shot and killed the deceased.

Floyd Turner operated a taxicab in the city of Middlesboro, and at about 7 o'clock on Saturday evening, April 6, 1935, a young man approached the taxi, which was parked on one of the main streets of Middlesboro, and was heard to direct Turner to drive him to Fern Lake, about two miles from the city. Fern Lake is an artificial lake owned by the Kentucky Utilities Company. Jim Venable is employed by the ultilities company as caretaker, and resides with his family near the edge of the lake not far from the boathouse. Between 7:45 and 8 o'clock he heard an automobile entering the grounds, and saw the headlights. It stopped near the boathouse, and immediately four or five shots were fired. There was an electric light near the boathouse and one on Venable's front porch. Venable's young son switched on these lights and, looking through the window, saw a man running away from the automobile. He was unable to recognize him. Venable observed that the automobile was a taxicab, and, believing that it was owned by a Mr. Yeary of Middlesboro, he got into communication with Yeary over the telephone and notified him of the occurrence. Yeary in turn notified the police department of Middlesboro, and within a few minutes several policemen arrived on the scene. They found Turner at the driver's wheel of the automobile, his body slumped over in the front seat. He had been shot twice, once in the head and once in the body, and evidently had died instantly.

At the trial, three witnesses testified that they saw a young boy approach Floyd Turner's taxicab, and heard him request Turner to drive him to Fern Lake. None of them was acquainted with appellant, and only one positively identified him as the boy who entered the taxicab on the occasion. Mrs. Virginia Pattison testified as follows:

"Q. Did you learn of the death of Floyd Turner? A. Yes, sir.

"Q. Did you see him on the day that he was killed or that evening that he was killed? A. Yes, I did.

"Q. Where did you last see him? A. On 19th Street, right close to Cumberland Avenue at the place where he usually parked his car.

500

"Q. Is that known as Ginsberg's corner? A. Yes sir.

"Q. Did you see any other person there with him? A. Yes sir.

"Q. Whom did you see? A. I just can't tell you definitely who I saw. I saw a little youngster come up to the car.

"Q. Do you now see him in the court room? A. I am going to look over to this little defendant. I wouldn't want to say that this is the youngster, but he looks like him.

"Q. He looks like the same person? A. I wasn't up close enough to say definitely. I know the impression he made in my mind and I saw him and got just a general outline of the little fellow.

"The Court: Whom do you have reference to? A. The little boy there.

"The Court: The young man sitting there? A. Yes, by Judge Herd.

"Q. State to the jury what happened when this young man came to Floyd Turner's car. A. I was approaching young Turner's car from the bus depot and the little fellow came walking hurriedly.

"Q. What do you mean by 'the little fellow?' The defendant? A. It looked like an extremely young boy and I was going toward Turner's car, and he was walking in a slant like this, and I was coming from the rear and the boy more toward the front end of the car, and Turner leaned over and said to him 'get in the front seat with me,' and the boy that was coming up was extremely excited and his hair standing on end, it seemed to me, and I saw that he was in a state and I thought it was a half-witted boy that lived over in Cumberland Gap, and I went down there looking for the boy after young Turner was killed. I thought I could identify the boy without a doubt and inquired of several persons there, and went up the Virginia pike. That boy was a young Stegall and they said he had been in Virginia, and I said 'No, he has been in Middlesboro.'

"Q. When you found it was not the other boy —how did the boy compare with the one that got in the car? A. If his jacket was all dirty and his fingers dripping and his hand out like this and his shoulders hunched forward and a scared expression on his face it might be this boy."

M. V. Brown testified, on d i r e c t examination, that he, Harry Gaunt, and Floyd Turner were talking when the appellant approached the automobile and asked Turner to take him to Fern Lake. On cross-examination, he testified as follows:

"Q. You saw him get in the car? A. I saw him but didn't pay no attention to him until he got in the car.

"Q. Then how do you know it is the boy? A. He says he is the boy; that's all I know.

"Q. Who says he is the boy? A. He says he is the boy.

"Q. You don't know that it is the boy? A. (No answer).

"Q. How long have you known Floyd Turner? A. About two years.

"Q. He was a pretty good friend of yours? A. No, I just knew him as a taxi man.

"Q. Do you state positively that this is the boy? A. Well, he looked like the boy.

"Q. Do you state positively that it is? A. He looked like the boy that got in the car; that's all I know."

The presiding judge then asked if he could make it any more definite than that, and he replied, "No, he just looked like the boy to me." Harry Gaunt testified that he had never seen appellant before that occasion, but he identified him as the boy who got in the car and drove away with Turner.

Appellant's defense was an alibi, but he produced no witness who was able to state positively that he saw him in Middlesboro at or about the time of the killing. A number of witnesses testified that they saw him at a certain place in Middlesboro playing checkers between 8:30 and 10 o'clock that night. It was shown

that one could walk from the scene of the killing to Middlesboro in about 45 minutes. One of the bullets was removed from Turner's body, and the commonwealth proved that it had been fired from a pistol owned by Eastridge, and which was found in Eastridge's home about a week after the killing. Appellant admitted that he was with Eastridge and Anderson in Middlesboro an hour or two before the killing.

The foregoing is, in substance, all of the evidence tending to connect appellant with the murder of Turner except his alleged confession, which was made the day after he was arrested. He was arrested on Sunday, April 14, 1935, and was questioned as to his whereabouts on the evening of the homicide. He was again questioned by the county attorney in the presence of members of the police force and by the county attorney alone on the following day, and about midnight he made a statement admitting that he had killed Turner for the purpose of robbery, and had used Eastridge's pistol which he returned to Ed Anderson.

On this appeal, the appellant relies upon the following grounds for a reversal of the judgment: (1) The alleged confession having been obtained by duress and threats is not admissible as evidence; (2) the court erred in submitting to the jury the question as to whether or not the alleged confession had been made voluntarily; (3) the record fails to show that the circuit court properly acquired jurisdiction of appellant, he being under seventeen years of age; and (4) improper remarks of the county attorney and commonwealth's attorney in their closing arguments to the jury, which prejudiced his substantial rights.

The appellant repudiated his confession, and claimed that it was made as the result of threats by the county attorney and the continuous plying of questions. On the other hand, the county attorney and the police officers who were present when the confession was made testified that appellant was not threatened nor plied with questions, but that he made the confession voluntarily.

Section 1649b-3, Kentucky Statutes, forbids the introduction in evidence of any confession obtained by means of sweating, as defined by section 1649b-1. That

section defines sweating to be "the questioning of a person in custody charged with crime in an attempt to obtain information from him concerning his connection with crime or knowledge thereof, after he has been arrested and in custody, as stated, by plying him with questions of by threats or other wrongful means, extorting from him information to be used against him as testimony upon his trial for such alleged crime." In Bennett v. Com., 242 Ky. 244, 46 S. W. (2d) 84, 85, it was said:

> "The mere fact that a confession or statement may be made to officers does not render proof thereof incompetent, if it was voluntarily made. Plying with questions means the persistent and repeated propounding of inquiries to elicit a desired answer, carried to such an extent that the prisoner feels required to answer as the questioner wishes in order to escape from the pressure."

The evidence as to how the confession was obtained was in sharp dispute, and the court, after first having heard the evidence on this point out of the presence of the jury, properly permitted it to be repeated before the jury.

Appellant complains because the court submitted to the jury the preliminary question affecting the competency of the written confession, and directed them not to consider it for any purpose if they should believe, from the evidence, that it was procured by means condemned by the statute. It is his contention that the question of the competency of the confession should have been determined by the court. It is the rule in this jurisdiction that, where the evidence is conflicting as to whether a confession was voluntarily made or was procured by unlawful means, the question of fact should be submitted to the jury. Bennett v. Com., 226 Ky. 529, 11 S. W. (2d) 437; Com. v. McIntosh, 257 Ky. 465, 78 S. W. (2d) 320.

It is next insisted that the Bell circuit court was without jurisdiction, since appellant was only sixteen years of age when the offense was committed, and the record fails to show that the procedure for juvenile offenders, required by section 331e-1 et seq. of the Kentucky Statutes, was followed before the indictment was

returned. Before a male child under seventeen years of age can be indicted and tried in the circuit court, the procedure outlined in these sections of the statutes must be had in the juvenile court. Edwards v. Com., 264 Ky. 4, 94 S. W. (2d) 25; Com. v. McIntosh, supra; Grise v. Com., 245 Ky. 220, 53 S. W. (2d) 362; White & Deaton v. Com., 242 Ky. 736, 47 S. W. (2d) 548; Newsome v. Com., 227 Ky. 710, 13 S. W. (2d) 1046.

A supplemental transcript of the record has been filed, which shows that while the examining trial was being held before the county judge the question of appellant's age arose. Thereafter, appellant's parents were summoned, and the matter was heard by the county judge, acting as judge of the juvenile court, and appellant was transferred to the circuit court as provided by section 331e-5. The record now shows that the circuit court acquired jurisdiction of appellant.

The complaint of the closing arguments of the county attorney and commonwealth's attorney present a more serious question. The county attorney, in the course of his argument, said:

"These little boys saw David Crawford running in front of his car."

The defendant objected and the court admonished the jury as follows:

"Gentlemen, if there should be any mistake by the lawyers, you will be controlled by the evidence."

Such an admonition is not sufficient. In Greenwell v. Com., 125 Ky. 192, 100 S. W. 852, 855, 30 Ky. Law Rep. 1282, it was said:

"The court, when the defendant's attorney objected to certain statements made by the commonwealth attorney as being outside of the record, should not simply have admonished the jury that it was the duty of counsel to keep within the record—that is, the evidence admitted by the court, and the instructions of the court to the jury—and that, if counsel said anything outside of the record, it was the duty of the jury to disregard it. The court should not have thus left the jury to determine whether the counsel was going out of the record or not. If he was out of the record, the

court should have sustained the objection, and stopped the argument; or, if he was not out of the record, he should have overruled the objection. If the court did not remember the evidence, he should have refreshed his recollection. The jury should not be allowed to hear an improper argument with an admonition that they are to disregard it if it is outside of the record, for this leaves to the jury a matter which the court should determine.''

In the statement complained of, the county attorney, in effect, told the jury that witnesses had seen appellant at the scene of the crime just after it was committed. There was no such testimony. Only one boy, Paul Venable, testified, and he stated that he saw a man run away from the automobile, but he did not recognize him. If the commonwealth had produced a witness who saw appellant at the scene of the crime, his whole defense would have been destroyed. The statement was outside the record. If it had been true, it would have constituted the most convincing evidence of appellant's guilt produced by the commonwealth. The county attorney also said:

''The father gets on the witness stand and is asked if he has been convicted of a felony, and he said yes. And is asked what it was and he said murder.''

The commonwealth's attorney said:

''This boy, 16 years of age, is the son of a convicted murderer.''

This statement, in substance, was made more than once, and in each instance the defendant's objection was overruled. Appellant's father did testify that he had been convicted of a felony, but this evidence was admissible solely for the purpose of affecting his credibility as a witness. The commonwealth's attorney treated it as substantive testimony, and his repeated reference to it could only have had the effect of prejudicing the minds of the jury. The commonwealth's attorney also made the following statements, objections to which were overruled:

''Here in this courtroom a short while ago I all but got down on my knees and prayed to the

jury to give a death penalty, but one weak-kneed juror would not give the death penalty and if that man had been given the electric chair there wouldn't have been three or four other men shot out on lonely roads in taxis the last fourteen months. * * *

"As I have said before, I think what ought to be done in a case like this, the man ought to be taken out in the courthouse yard, in front of his family and friends and acquaintances, and those he associated with, and hanged in the corner of the yard, and his neck broken. * * *

"And he will be turned out of the penitentiary by Governor Laffoon, and Governor Laffoon said in Pineville a few months ago that he was getting more men from Harlan and Bell counties than any other section of the State. * * *

"Turn him loose and I can tell you that inside of two or three years there will be another jury, if not in Bell county, then in some other county, trying him for something else."

While it has been held that similar statements were not prejudicial though they were criticized as improper, the prejudicial effect of such an argument depends upon the facts of the particular case. In numerous opinions of this court, arguments of attorneys for the commonwealth, similar to the arguments in this case, have been severely condemned, and in many instances the improper argument has been the sole cause of the reversal of the judgment. The line of demarcation between proper and improper argument has been clearly defined in these opinions, and while in many cases improper arguments, though condemned, have, under the particular facts in those cases, been held not so prejudicial as to warrant a reversal of the judgment, yet attorneys for the commonwealth should not transgress the bounds of legitimate argument and thus subject the commonwealth and the accused to the risk of another trial with the expense and delay incident thereto. In spite of our repeated rulings on the subject, we have been compelled to reverse a number of judgments recently on the sole ground of improper argument by the commonwealth's attorney. Robinson v. Com. 264

Ky. 394, 94 S. W. (2d) 1004, decided May 19, 1936; Thacker v. Com., 263 Ky. 97, 91 S. W. (2d) 998; Nolan v. Com., 261 Ky. 384, 87 S. W. (2d) 946. In the Thacker Case the judgment was reversed solely because the attorney for the commonwealth misquoted the testimony of a witness, and the objection to the argument was overruled. Other recent cases in which the subject has been discussed are: Murphy v. Com., 263 Ky. 347, 92 S. W. (2d) 342; Drake v. Com., 263 Ky. 107, 91 S. W. (2d) 1009; Smith v. Com., 262 Ky. 748, 91 S. W. (2d) 31; Lee v. Com., 262 Ky. 15, 89 S. W. (2d) 316; Tate v. Com., 258 Ky. 685, 80 S. W. (2d) 817; Berry v. Com., 227 Ky. 528, 13 S. W. (2d) 521.

In view of the appellant's youth, the circumstances under which the alleged confession was made which render the question of its competency a close one on the facts, and the meagerness of the other testimony tending to connect him with the crime, we are constrained to hold that the arguments complained of were prejudicial.

The judgment is reversed, with directions to grant appellant a new trial, and for further proceedings consistent herewith.