# Underwood v. Commonwealth.

(Decided Oct. 9, 1936.)

C. M. C. PORTER for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

Tried under an indictment which charged him with murder, appellant was found guilty and given the death penalty. Motion for a new trial was overruled, judgment entered in accord with the verdict, from which this appeal is prosecuted.

The homicide occurred early in the morning of April 29, 1936. The man killed was Wallace Van Fleet, proprietor of a railroad restaurant in Lebanon Junction, in which place the homicide took place. Deceased was also the night marshal of the town.

On the day immediately preceding the killing, Jasper Metcalfe operating a truck, his son, and Underwood

went to Louisville. Metcalfe testifies that on his return he had some empty drums to deliver to some one in Lebanon Junction. Before he got there he had trouble with his truck and went for a wrecker. He left appellant with his truck; when he came back he was gone, but came up in about 15 minutes with a man named Brashear. They then went on to Lebanon Junction, parked the truck and proceeded to the railroad restaurant, as witness says, to get something to eat. They went into the restaurant and appellant drank a glass of beer, then walked back to the kitchen, "but didn't stay long." It seems that he went into the kitchen a second time and when he came out Charlie Hall a clerk, ordered him out telling him that he was not allowed in the kitchen, "it was against the rules," and an argument arose between Hall and appellant. At this point some one went outside and told Van Fleet of the argument, and he came in and told appellant that "they couldn't allow him back in the kitchen; they had a town ordinance against it." Appellant then said, "Well"; walked out on the steps of the restaurant and asked "Is this all right?" and Van Fleet replied, "That's all right with me." On the outside appellant then began to say "some pretty rough things about the boy who was working in there." The boy picked up two or three empty Coca-Cola bottles, walked to the door and stopped. Appellant tried to get him to come outside, but he went back in and behind the counter. Witness also says that some time during the argument Van Fleet advised him to take appellant home, else he would be compelled to arrest him, and finally witness persuaded appellant to leave, and he took him as far as his (the witness') home on his truck.

On the way out appellant said, "Now Wallace Van Fleet has run over me as long as I'm going to let him; I am going home and get my gun and load it and coming back down here to-night, and me or Wallace Van Fleet one will die tonight." He was advised to "forget it" and go home and go to sleep, but said "No, I am going to do what I said and you'll hear about it in the morning." Witness says that appellant had been drinking beer at several places during the day and night. He estimates the time he let him out at his home to have been between 10 and 11 o'clock, and says that at that time "he could walk all right and had a very good memory." He did not see any gun on or about appellant,

but several times during the day he saw "two 32. cartridges."

Charlie Hall the only witness who saw what occurred just prior and up to the time the shot was fired that killed Van Fleet, testified in substance to what had occurred in the restaurant up to the time when appellant left, as was recounted by Metcalfe. Witness says that about 10 minutes after 12 o'clock appellant came back in a car, drove up and parked back of the restaurant, and Van Fleet came in the front door and stopped by the counter. Appellant came in and ordered a "big beer" and Hall turned to draw it for him, and the "next thing I heard George Underwood said, 'stick 'em up Wallace.' I looked around and George had a pistol, and he walked around to the end of the counter and repeated his command, and appellant had a gun in each hand and shot Van Fleet in the arm." Hall, believing as he said, that appellant would shoot him, turned and ran through the kitchen door and as he got halfway through the kitchen he heard another shot. The witness jumped off the back porch, hid in a field and remained there until a car passed going away from the restaurant, which he recognized as the one in which appellant had driven up and parked. A few minutes thereafter he went back to the restaurant and called Van Fleet; receiving no answer he went and got a neighbor and they went back. They found Van Fleet dead on the floor, eight or ten feet away from where he had been standing when the first shot was fired. He had been shot twice, one charge taking effect in the arm and the other in the head. Witness says that at the time when Van Fleet came into the place he had a piece of fishing pole in his hand. He did not see Van Fleet have, draw, or attempt to draw any weapon. When his body was removed the undertaker found a pistol in the holster on Van Fleet's left side, and a blackjack in his hip pocket.

The telegraph operator at the railroad station says he saw Van Fleet shortly before midnight; that he had on a zipper sweater-jacket and had a revolver in the holster on his left side. He went over to the restaurant about 10 minutes after the shooting and saw his pistol in the holster just as he had seen it before 12 o'clock. The sheriff was apprised of the tragedy shortly after midnight, and later some woman called over the phone and said that appellant was at her home and wanted to

surrender. The sheriff went to the place and appellant surrendered. He had two pistols on his person. One was fully loaded and the other had three empty shells in it.

Virgil Underwood a brother of appellant, said he was living with appellant; that after 11 o'clock on the night of the homicide, appellant came home "crying and cussing" and wanted witness to go to town with him and he did start back with him, but before they got to town witness jumped out of the car and "ran off and left him." He says that appellant lit a lamp when he came in, and said he was going to get his gun and go back to Lebanon Junction; that he got two guns, and said he was going back to shoot Wallace Van Fleet. "He carried one gun in his hand and one in his pocket." The boy said appellant had the appearance of having had "plenty of whiskey."

Appellant testified for himself and gives in detail testimony as to what occurred during the day on the trip with Metcalfe, particularly on the return trip, and it was substantially as Metcalfe had testified, except he says that during the day he had taken several glasses of beer and two or three drinks of whisky out of a half-pint bottle. Coming to the point of time when he, Metcalfe and Brashear went into the restaurant, he says he drank a beer and one of the party had something to eat. After drinking his beer, he went back into the kitchen. He was under the belief that "they had been selling whiskey in the back of the restaurant. I wanted to buy a half pint of whiskey to give Brashear to get rid of him." He says the boy ordered him out of the restaurant, saying, "That's the orders I got." Van Fleet then came along, and appellant says that he told him that he and Metcalfe wanted to go home and asked Van Fleet to keep Brashear in conversation "until we get away," and that Van Fleet replied, "It don't make any difference whether he goes home or not." Appellant then left the restaurant, but came back and bought some cigars and started out of the restaurant, when Van Fleet said, "I thought I told you to go home." Appellant says he then started home and had "got out on the crossing about half way," and stopped "to take the wrapper off my cigar," and was lighting it when Van Fleet came up and grabbed him by the arm and said, "I told you to go home, and when I told you to go home

I meant for you to go." He says that Van Fleet aimed to strike him on the head with a blackjack, but he "ducked" and the blow struck him on the shoulder, and "he struck me on the head, and from that lick I remember staggering on; outside of that I don't remember anything else that happened except through a haze, until I come to my senses in Hardin County." He says he did not remember riding with his brother in the car. He then relates that it "seems to me I wanted a glass of beer and I went back to the restaurant"; that Van Fleet was leaning over the counter. He ordered the beer and Van Fleet turned around and said, "Why did you come back down here," and I said, "I came back down here to get me some beer." Van Fleet then said, "Didn't I run you home while ago," and I said, "Yes sir, and I went home." Van Fleet "walked around the corner mumbing something and when he got around the counter and said, 'G. D you I am going to let you have something,' I said wait a minute, and he reached for his gun; I told him to keep his hands off his gun, and I started to tell him I would go on home and he cursed me again, the best I remember, and I told him to keep his hands off his gun and to keep away and it didn't seem to me that he did what I told him, but he just kept coming and reaching for his gun, and I remember firing through a haze. Outside of that, that's all I remember."

He says that after that he had a headache, "just commenced walking and turned up at some house and asked a man to call the sheriff." The sheriff came, and, as appellant says, found him with two guns. He says that ever since he received the lick on the head he has had headaches and earache. On cross-examination appellant was put to a thorough test of memory with regard to every detail beginning with the morning of the 28th, up to and after the time of the examining trial following the homicide.

Lillian Davis, a sister of accused, testified that early on the morning of April 29 appellant came to her house and came in crying. A fellow prisoner testified that a few days before the trial he picked some dry blood from one of appellant's ears. Dr. Moore, a general practitioner, made a physical examination of appellant while he was in jail. He testified that appellant had an enlargement of the parietal bone over the left ear; that it was the size of a 25-cent piece, and appeared to have

been caused by a lick from some blunt instrument, the effect of which, he said in answer to a hypothetical question based on the assumption that appellant had been struck on the head with a blunt instrument, in his opinion, "would have affected his mind at the time." That a blow such as described by appellant to him "would serve to daze any one's mind for some length of time; that blow possibly dazed him, and he was possibly in an unconscious condition; that he would know in part what he was doing. He would only have partial remembrance." Asked if such a blow as described would daze one so that he would not know what he was doing, he said, "If I could have seen him immediately after he was hit I could have told you. * * * It might have done that in part, but to say that it dazed him so that he did not know what he was doing is a difficult question for me to determine, not seeing him for thirty days after it happened."

Metcalfe, who had been with appellant all the day of the 28th, except about 15 minutes early that night, and who went with him to the restaurant and later took him part of the way home, testifying in rebuttal says that at no time, from the moment they went in the restaurant until they started home, was Van Fleet outside of the restaurant; that he was with appellant or in his sight all the time and he did not see the marshal strike appellant; that he had no opportunity to strike him without his having seen him do so. This was in substance all the proof.

Upon these facts the court submitted the case to the jury giving them six instructions. The first, in apt language was the willful murder instruction; the second a correct voluntary manslaughter instruction; No. 3, a self-defense instruction; No. 4, an instruction as to the quality of appellant's mind at the time of the homicide; No. 5, the usual reasonable doubt instruction, and No. 6, correctly defining the words and terms "willfully," "feloniously," and "malice aforethought."

While there were six or seven grounds in support of motion for a new trial urged, all save those hereinafter set out are waived. The first ground urged is that an attorney representing the prosecution in his argument to the jury said:

"Gentlemen of the jury it is a matter of common

knowledge that a sentence to the penitentiary for life only means eight years, and if you give the defendant a life sentence he will be back home in eight years and will be, at the end of that time, ready to shoot some other man.''

Objection was made by defense counsel to the statement, and the court sustained the objection, but did not admonish the jury not to consider the same. Counsel's contention seems to be mainly that the court, though sustaining the objection, failed to give the admonition. This contention may be answered by saying that our conclusion is that the language used by counsel was not such as to prejudice the substantial rights of appellant, hence it was not error for the court to fail to admonish the jury. In other words, the matter may be treated as if the court had overruled appellant's objection. This contention is fully disposed of by an excerpt from Holmes v. Com., 241 Ky. 573, 587, 44 S. W. (2d) 592, wherein the language used in argument, and which was there the basis of complaint, was similar to that here used and objected to. In that case, denying a reversal, the court said:

"This and similar statements have so often come under the condemnation of this court, it is to be wondered that the attorneys for the commonwealth do not refrain from making them. However, our attention has not been called to any case holding that such statements, standing alone, will constitute reversible error except the case of Berry v. Com., 227 Ky. 528, 13 S. W. (2d) 521, where it was so held under the peculiar facts therein. The cases of Chappell v. Com., 200 Ky. 429, 255 S. W. 90, and Postell v. Com., 174 Ky. 272, 192 S. W. 39, in which similar arguments were criticized and condemned, were not reversed because of the improper argument. There are numerous cases which give recognition to the impropriety of such argument yet hold that it does not constitute such prejudicial error as will warrant a reversal. Bolin v. Com., 206 Ky. 608, 268 S. W. 306; Hall v. Com., 207 Ky. 718, 270 S. W. 5; Moore v. Com., 223 Ky. 128, 3 S. W. (2d) 190.''

To this list may be added most of the cases cited and relied upon by appellant, a casual survey showing that they are in the same class with the cases cited above

(excepting the Berry Case), hence offer no relief to appellant on this ground. See Estepp v. Com., 185 Ky. 156, 214 S. W. 891; Seymour v. Com., 220 Ky. 348, 295 S. W. 142; Phillips v. Com., 227 Ky. 212, 12 S. W. (2d) 305; Tiernay v. Com., 241 Ky. 201, 43 S. W. (2d) 661. The case of Crawford v. Com., 264 Ky. 498, 95 S. W. (2d) 12, is perhaps in the class with the Berry Case, supra, and the argument there dealt with statements of facts not appearing in the record, coupled with inflammatory remarks. We may add the following cases not cited by counsel for appellant, the reasonings and conclusions in each of which are sufficient to compel us to hold no commission of error in this case on the ground of improper argument: Glenday v. Com., 255 Ky. 313, 74 S. W. (2d) 332; Tate v. Com., 258 Ky. 685, 80 S. W. (2d) 817; Lee v. Com., 262 Ky. 15, 89 S. W. (2d) 316.

Counsel strenuously argues that what may be admitted to be a technical error in instruction No. 4 is a sufficient ground for reversal. In that instruction on insanity, which was given by the court, on what appears to be rather meager evidence, the court said (we interpolating the word which should have read otherwise, and one word which was inadvertently omitted):

"Although the jury may believe from the evidence beyond a reasonable doubt that the defendant did shoot and kill Wallace Van Fleet with a pistol, yet if the jury believe from the evidence that when he did so he was of unsound mind, yet [you] should find him not guilty, and state in your verdict that you find him [not] guilty on the grounds of insanity."

The above paragraph was immediately followed by an approved definition and explanation of that degree or quality of mind, which, if found by a jury to have existed would excuse the wrongdoer for his act. The court said:

"* * * Before the defendant can be excused on the ground of unsoundness of mind, the jury must believe from the evidence that at the time of the killing the defendant was without sufficient reason to know right from wrong, or that as a result of mental unsoundness or a blow on the head he had not then sufficient will power to govern his actions, by reason of some insane impulse which he could not resist or control."

The word "yet," .as used secondly in the instruction, should have been "you," but no one could say that a jury composed of ordinarily intelligent persons could or would be confused or misled by the use of that word. The first part of the sentence quoted, eliminating the second clause which omits the word "not," correctly states the law when taken in conjunction with the explanatory paragraph. Both together constitute the whole law of the case on the subject of mental incapacity. When the first paragraph is analyzed, it will appear to any reasonable mind that the jury was clearly told that, if they should believe appellant mentally unbalanced as per the explanatory definition, they should declare him not guilty and state the fact in their verdict. Section 268, Criminal Code of Practice.

The whole of the instruction must be read, and, when this is done, we are of the opinion that it was not such as to confuse or mislead a reasonably intelligent jury. It will not be permitted for appellant to select only a portion of an instruction for criticism and overlook other portions thereof. We have held that in order to determine error or no error, the entire instruction must be considered. Smith v. Com., 148 Ky. 60, 146 S. W. 4; Connor v, Com., 118 Ky. 497, 81 S. W. 259, 26 Ky. Law Rep. 398; Dennison v. Com., 198 Ky. 376, 248 S. W. 878; Hendrickson v. Com., 235 Ky. 462, 31 S. W. (2d) 712; Howard v. Com., 246 Ky. 378, 56 S. W. (2d) 362; Tiernay v. Com., 241 Ky. 201, 43 S. W. (2d) 661.

In Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4, we said that something must be left to the good common sense and fair judgment of the jury. This instruction in its entirety is clear and easily understandable to the average mind, and we conclude that the omission and substitution complained of here were not such as to be confusing, and that no prejudicial error was committed in this respect.

The final ground insisted upon for reversal was the refusal of the lower court to permit Mrs. Lillian Davis, a sister of accused, to answer an unasked question. It appears that on the night of and after the homicide appellant went to her home. After telling of appellant coming there she was asked as follows:

"Q. What time in the morning was it? A. I don't know, it was after midnight.

"Q. What did he do? A. Well, he didn't do anything but come in and he come in crying.

"Q. Had you gone to bed? A. Sure I had at that time of night.

"Q. Describe [Objection to the witness testifying as to the conduct and condition of the witness after the commission of the crime; objection sustained by the court; objection and exception]."

The error here was perhaps in the precipitancy with which counsel for appellant objected and the court's ruling on that objection before the question or any question was formulated. No one can guess as to what the unfinished question would have been, nor can we guess what the answer might have been. Assuming, however, that both the question and answer might have had to do with his conduct, his physical condition, or his actions, the court cannot say there was error, because no avowal was made by objecting counsel. Both question and answer may have been admissible, but as to error we cannot surmise, nor can we conclude there was error in the absence of avowal. Hill v. Com., 191 Ky. 477, 230 S. W. 910; Hall v. Com., 229 Ky. 646, 17 S. W. (2d) 751; Harper v. Com., 255 Ky. 566, 74 S. W. (2d) 951; Tipper v. Com., 1 Metc. (58 Ky.) 6. The case of Moore v. Com., 92 Ky. 630, 18 S. W. 833, is relied upon by appellant on this point. For obvious reasons, it is not sufficient authority to hold that there was prejudicial error in the particular under discussion.

We have reached the conclusion, after a most careful review of the whole case, that the appellant has had a fair and impartial trial. His two defenses, as presented by him, were fairly submitted to the jury. If the testimony of Hall and others is to be believed, the homicide was totally inexcusable. If appellant's testimony is true, he was not guilty. The jury had the sole right of determination. They evidently believed the testimony of the witnesses for the commonwealth, which under the law, was their province to so do and since this is our conclusion on review we are compelled to affirm the judgment.

Judgment affirmed.

The whole court sitting.